NICHOLS v. SMITH et al.—111 S. W. (2d) 911.

Middle Section.   May 24, 1937.

Rehearing denied Aug. 14, 1937.

Petition for Certiorari denied by Supreme Court, December 17, 1937.

L. M. Davis and Trabue, Hume & Armistead, all of Nashville, for plaintiff in error.

Leftwich & Denney, of Nashville, for defendant in error.

FAW, P. J. John Nichols, administrator of the estate of L. P. Davis, deceased, sued E. Gray Smith and Sam Henderson, in the circuit court of Davidson county, on February 20, 1936, for $15,000 as damages for the alleged wrongful death of his intestate.

The case was tried before the Honorable O. W. Hughes, special judge, and a jury in the Second circuit court of Davidson county, and the jury found the issues in favor of the plaintiff and assessed his damages at $5,000, and judgment was rendered accordingly by the court.

On the hearing of a motion for a new trial filed by the defendants, the trial judge held that he had erred in overruling a motion on behalf of the defendants for peremptory instructions in their favor (which motion had been made at the close of all the evidence), and he thereupon set aside the verdict of the jury, sustained the defendants' motion for peremptory instructions, and dismissed plaintiff's suit at his cost. Thereupon, the plaintiff moved for a new trial, but his motion was overruled, and, in due season, he prayed, obtained, and perfected an appeal in error to this court, and is here insisting that the trial court erred in setting aside the verdict of the jury and dismissing his suit. Plaintiff insists, through four assignments of error, stating his contention in different aspects, that "there was material evidence presenting an issue of fact for the jury's determination on the question of defendants' liability," and that it was, therefore, error to direct a verdict for the defendants.

For the defendants it is insisted that there is no evidence reasonably tending to prove that the injuries and death of plaintiff's intestate were the proximate result of negligence of the defendants, or either of them.

Plaintiff's declaration contains but one count, and, as a convenient method of stating certain undisputed facts, we here quote certain parts of the declaration supported by undisputed evidence, as follows:

"Plaintiff is a citizen and resident of Nashville, Davidson County, Tennessee, and is and has been for sometime the duly qualified and acting Administrator of the estate of L. P. Davis, deceased. Proper letters of administration were issued to him by the County Court of Davidson County, Tennessee, and said letters of administration will be exhibited to the Court on or before the hearing.

"The defendant, E. Gray Smith, is a citizen and resident of Nashville, Davidson County, Tennessee, and is and for many years prior to the time of the acts hereinafter complained of, engaged in the business of selling automobiles and is and has been doing business under the trade name of E. Gray Smith Motor Company, being the dealer for Packard motor cars. He maintains a garage and salesroom on West End Avenue in the City of Nashville and was, on and before the time of the acts hereinafter mentioned, the owner of a certain Packard automobile truck, the same bearing license number for the State of Tennessee for the year 1935 16-790, as registered in the office of the County Court Clerk for Davidson County. Also at the time of the acts complained of, the defendant, E. Gray Smith, had in his employ a colored chauffeur, the co-defendant, Sam Henderson, whose duties in the course of his employment consisted of obeying the instructions and directions of the defendant, E. Gray Smith, and more particularly of driving and operating his various automobiles and trucks, and particularly the truck above mentioned. . . .

"Plaintiff's deceased, the said L. P. Davis, was a man sixty-five years of age, in strong and vigorous health and left surviving him four children, viz., W. A. Davis, T. C. Davis, John Davis, and one daughter, Mrs. Elsie Davis Syers, for whose use and benefit this suit is brought."

The remaining averments of plaintiff's declaration are as follows:

"Plaintiff would show to the Court that on or about October 17th, 1935, at about 10:30 p. m., his deceased, L. P. Davis, was negligently, carelessly, recklessly and unlawfully knocked down and run over by the automobile truck above described, being then and there owned by and on the business of the defendant, E. Gray Smith, and being then and there driven and operated by his co-defendant, Sam Henderson, his colored chauffeur while on the business of and acting for and in behalf of the said E. Gray Smith. Said injuries to plaintiff's deceased were so severe and violent in their nature as to result in his death in short while thereafter. . . .

"Plaintiff would further show to the Court that on or about October 17, 1935, at approximately 10:30 p. m. his deceased, the said L. P. Davis, was walking in an Easterly direction proceeding from the West toward the East side of Gallatin Avenue, or Gallatin Road at its regular established intersection with Leland Avenue and was at a proper place for pedestrians and was in the exercise of ordinary care for his own safety. At this point the Gallatin Pike extends in a generally North and South direction, is a well-paved thoroughfare, and is straight for a considerable distance both North and South of its intersection with Leland Avenue. The defendant's truck as above described, being operated under the conditions above set out, was proceeding in a Southerly direction on the Gallatin

Road or Gallatin Pike. The driver, Sam Henderson, while acting for and in behalf of his co-defendant, the said E Gray Smith, was driving said truck at a negligent, reckless and unlawful rate of speed under the circumstances, was not keeping a proper lookout ahead, did not have his said truck under control, and while thus driving in such an unlawful manner caused his truck to be driven into and against plaintiff's. deceased while he was proceeding across the pike in plain, open and unobstructed view had the defendant been in the exercise of ordinary care.

"Plaintiff's deceased was struck with great force and violence by the front end of said truck and was caused to be picked up by the front end of the truck and hurled against the hood and windshield and then thrown back down to the street. He was horribly mangled, broken, crushed and otherwise injured both externally and internally, was rendered unconscious, and although he was rushed with immediate dispatch to the hospital, he died in a short while thereafter.

"Plaintiff would further show that his deceased's death was directly and proximately caused by the negligence of the defendants as above set out and of each specific act thereof, and the colored chauffeur, Sam Henderson, ran into and struck plaintiff's deceased without ever seeing him, although plaintiff's deceased was clearly visible to him had he been in the exercise of ordinary care and had his truck under control."·

It seems to have been conceded throughout the trial that plaintiff's intestate was killed at the time and place stated in the declaration; but it was not admitted that he was killed in the manner and under the circumstances averred in the declaration, or that either of the defendants was guilty of negligence which caused his death.

At the trial below, plaintiff called and examined as his witness defendant E. Gray Smith, who testified that he owned the "Packard automobile truck" described in the declaration; that it was a 1926 model passenger car, which had been converted into a three-fourth ton truck by the attachment of a truck body; that defendant Sam Henderson was employed by witness at the time in question and for about a year prior thereto, and was driving witnesses' truck in the course of such employment at the time it was reported that L. P. Davis was killed; that witness knew nothing of the accident of his own knowledge, but that it was reported to him and he "talked with Sam" (defendant Henderson) "about it" immediately after the accident; that "Sam said the accident happened on the Gallatin Pike at Leland Avenue, just outside of the city limits;" that "he (Sam) was driving over on the right-hand side of the road and going slow;" that "he never did see Mr. Davis until he struck him" and he was "on the hood of his car" and "struck the windshield;" that "he said another car passed him, and it was his idea that as the

other car passed it struck·this man and threw him upon the hood of this truck he was driving."

Defendant Smith also testified that, after the accident, he examined the truck defendant Henderson was driving on the night Davis was killed and found no evidence of damage to the truck, except that the windshield was broken; that there were some dents in the right fender, but "they were old dents." A photograph of the front of the truck and another of the windshield were filed by this witness (on cross-examination), and they disclose no injuries to the truck other than the broken windshield and the dents on the fender mentioned by the witness Smith.

The "accident" in question was "investigated" by J. M. Murray, a motorcycle officer, and W. H. Thornton, a deputy sheriff, a few minutes after it occurred, and each of these officers testified as a witness for the plaintiff at the trial.

We here quote the material portions of J. M. Murray's testimony as follows:

"Q. Did you receive a call to make an investigation of an accident that occurred out here on the Gallatin Pike at Leland Avenue, in which L. P. Davis was killed? A. Yes, sir, and a gentleman came down to the jail and reported the accident.

"Q. In response to that call, did you make an investigation of that accident? A. Yes, sir, Mr. Thornton, a Deputy Sheriff and myself, did.

"Q. You and W. H. Thornton, both of you Deputy Sheriffs? A. Yes, sir.

"Q. Were you given a license number and you checked up on that, whose truck was involved in the accident? A. Yes, sir.

"Q. Where did you go? A. We checked up on the license and found out the truck was listed in the name of E. Gray Smith. We went down there then, and found the truck; and the truck had the windshield broken out, and I believe one of the headlights busted.

"Q. Where did you go, did you go to E. Gray Smith's garage? A. Yes.

"Q. That's out here at 2400 West End? A. Yes.

"Q. About what time of night was it you got out there? A. It must have been around ten or eleven o'clock.

"Q. In other words, as soon as you checked up on the license number and found out whose truck it was, you went right on out there? A. Yes.

"Q. Saw the truck out there? A. Yes.

"Q. Had the same license number on it that you had been given? A. Yes, sir.

"Q. You say the windshield on that truck was broken out? A. Yes, sir.

"Q. Was that pretty thick, heavy glass in that windshield? A. Pretty heavy, yes, sir.

"Q. Do you remember which one of the headlights were broken out? A. I won't be positive, but I think it was the left one. I won't be positive about that.

"Q. Was there anything wrong in evidence on this truck, other than the windshield and headlight—what about the fenders, any dents in them? A. There was some dents on the front fender, but whether it had been done recently I couldn't say; all I am positive about was the windshield.

"Q. The windshield? A. Yes, sir.

"Q. And the light, but the fender you won't be sure about that? A. That's right.

"Q. How about the hood of this Packard truck? A. I wouldn't say whether there was dents or not.

"Q. Do you remember anything about on the hood, about finger-prints or hand prints on the hood? A. No, sir, I don't remember.

"Q. While you were there making your investigation, examining the truck, did you talk with the negro driver, Sam Henderson? A. Yes, sir, he was there working on the truck when we went in.

"Q. He was there working on the truck when you went in? A. Yes, sir.

"Q. Did you talk with Sam Henderson, this colored driver about whether he was the one driving the truck? A. Yes, sir.

"Q. Did he admit he had been driving it? A. Yes, sir.

"Q. What statement did he make with reference to whether or not he ever saw Mr. Davis, the man that was killed, before he hit him? A. He said he was coming towards town on the Gallatin Pike and there were cars going in the opposite direction, and he said the first he saw of the man, that the man was on the hood of the car, saying, 'Oh Lordy, Oh Lordy;' and he said 'That's the first time I saw the man.'

"Q. That's the man he had killed, and that is the first time he had seen him was when he was upon the hood of his car, and crying, Oh Lordy? A. Yes, sir, that's what he said.

"Q. That was the statement made to you by Sam, right out there at the garage a very short while after the accident happened? A. I don't know whether he made that statement there or down at the jail. We took him to the Sheriff's office, and I don't remember whether we took a statement at the garage or not, I know we did down at the jail, but he talked to me too."

Cross-Examination:

By Mr. Denney:

"Q. He also told you he had been driving on the right-hand side of the road, and slowly? A. Yes, sir.

"Q. And he also told you that another automobile he thought hit

this man and threw him on the hood of his truck? A. He said that was the only way he could account for the man being on the hood, was by him being hit and knocked up there; that he didn't know when he hit the man. . . .

"Q. There was never any indictment returned against him, you took him to jail for examination? A. I don't recall there was.

"Q. You never testified down there in any case against him? A. No, sir.

"Q. You are not sure about any damage to this truck except the damage to the windshield? A. That's the only thing I am positive about.

"Q. This is a picture that's been exhibited, made on the 19th, after the accident happened on the 17th; does that appear to be about in the same condition that it was on the night you saw it, that truck? A. Yes, I believe it is. That windshield is the only thing I am positive about."

We also quote from W. H. Thornton's testimony as follows:

"Q. When you got out there at E. Gray Smith's garage, did you find the car or truck there that had the license number that had been given you? A. Yes, sir.

"Q. Describe the damage you saw to that car or truck, Mr. Thornton? A. The right fender had a small dent in it, and the radiator was dented slightly, and the right headlight glass was broken and the windshield was broken all to pieces, and glass was lying up in the seat.

"Q. Glass lying in the seat? A. Yes, sir, in the seat of the truck, and plenty of it on the floorboard. It was very thick, a little heavier than ordinary windshield glass, and there was marks where somebody had been on the top of the hood.

"Q. Could you see finger prints or hand prints on top of the hood? A. Yes, sir, you could see where they had been scrambling on the hood.

"Q. Was the colored boy, Sam Henderson, there at the garage at that time? A. Yes, sir.

"Q. Did he admit that he was the one that had been driving the car? A. Yes, sir.

"Q. Did you question Sam there? A. Yes, we taken him down to Sheriff's office, and questioned him.

"Q. What statement did he make to you and Mr. Murray about whether or not he ever saw Mr. Davis before he was struck? A. When we taken him in there and was talking to him as to whether he remembered hitting the man, and he said that the first thing he remembered the man was lying on top of his truck hollering, 'Oh, Lordy.' I said, 'Don't you remember seeing before that?' He said, 'Best I remember I was blinded by a light, and I don't know just what happened, it happened so quick, and I was so scared at a man

coming through the windshield.' I said, 'Do you know who hit him?' He said, 'I guess I did.' That's the statement he made to us.

"Q. And he said he never had seen him until he was coming through the windshield? A. That's right.

"Q. After that, did you go back out to the scene of the accident? A. Yes, sir.

"Q. Did you find any evidence there on the street that indicated a wreck had been there? A. Yes, we taken some glass from the Packard Service car, several pieces of glass, and compared it with the glass we found at the scene of the accident, and we found some big pieces, the biggest pieces of that glass we found at the scene of the accident in one place, and then another two or more places it was scattered all over the road.

"Q. Were there any definite places, you say, indicating a pile of glass here, and then another pile here? A. Yes, the best I remember, the pile here and another pile there; we found the best ones where the truck had been, near the scene of the accident, the glass wasn't broken quite so much there.

"Q. That glass was at the intersection of Gallatin Pike and Leland Avenue? A. Yes, sir.

"Q. And that is just beyond the City limits? A. Yes, sir."

Cross-Examination:

By Mr. Denney:

"Q. You saw glass at two different places, separated from each other? A. Yes, sir.

"Q. About how far apart? A. Around eight feet, something like that.

"Q. What kind of glass was it at that point, the farthest North from Nashville? A. It was all compared, and it looked like the same glass.

"Q. Looked like the same glass to you? A. Yes, sir.

"Q. Was there some glass, one of these pieces of glass seem to be headlight glass, did you see any headlight glass there? A. It seemed to be about all the same.

"Q. You made a statement about the headlight being broken, didn't you? A. Best I remember, there was a glass broken in the headlight.

"Q. Part of the glass you found came out of the headlight? A. I don't say that positively, but it could have been.

"Q. That's your best recollection? A. Yes, sir.

"Q. Sam told you also there in that conference, down at the County Jail that he was out on his right-hand side of the road? A. Yes, sir.

"Q. Told you he was driving slowly? A. Well, he said he was making between thirty and forty miles an hour.

"Q. Did you take a statement? A. Just what he told us, we didn't take a signed statement.

"Q. I want you to examine this car here, you are not positive, are you, Mr. Thornton, that there was a headlight out of Mr. Gray Smith's car? A. Well, not exactly positive.

"Q. Do you remember that to be about the same condition the car was in after the accident (exhibiting picture)? A. That dent in the radiator is just like it was, and this windshield was broken here, and all up on the hood was prints of where a man had been lying there.

"Q. Was it dented in? A. No, sir, it wasn't dented; it was dented over here, and this place in the fender was a very small place. This place here had been caved in.

"Q. There wasn't any dent in the radiator,—just a place in the dust on the radiator? A. That's right."

We think all of the material evidence bearing upon the issues before this court is embraced in the foregoing statement, except the description of the wounds and injuries on the person of the deceased, L. P. Davis, given by Frank D. Foust, the undertaker who embalmed his body. We quote the testimony of this witness:

"Q. Wish you would describe to the jury, Mr. Foust, the injuries that Mr. Davis had received that caused his death? A. It is all right for me to look at this memorandum?

"Q. That's in your own handwriting, is it? A. Yes, sir, it's my record.

"Q. That's all right. A. A wound over the right eye about 1½ inches long and a half inch wide; the entire chest was crushed and he was bruised all over. His leg was broken about three inches below the knee, just to the right of the front, a wound about one and a half inches long, two inches wide, and the bone was pushed out through the wound. This leg bone was sticking out about an inch through the wound. There was one on the left side of the head three inches from the top of the left eye, that means top of the eye here, one and a half inches long, one inch wide. There was a skull fracture, in other words, his skull was crushed. Bruises all over the back and over the legs and arms and even his hands. It looked like his neck was broken.

"Q. Let's see: His skull was fractured? A. Not fractured, but crushed, and oozing out.

"Q. Crushed, and the brain was sticking out through the wound? A. I don't know the substance, but it was crushed, like you would stick it in a vise and crush it, almost flat.

"Q. He was just one mass of bruises over his entire body? A. That's right.

"Q. And what about the injuries to his chest? A. His chest was crushed—crushed in.

"Q. Do you know about how many ribs were broken? A. Looked to me like all of them.

"Q. Then you think his neck was broken? A. Yes, sir.

"Q. Then on his right side a few inches below the knee— A. Yes, sir, right in front.

"Q. In front and two or three inches below the knee, were both of the bones broken at that point? A. The main bone was sticking out of the wound. I had to take it and push it in and sew it so the wound wouldn't leak.

"Q. About how big is that big bone? A. I don't know; I couldn't answer that right. It looked like it was about, I will say, about that big around best I can tell.

"Q. You are indicating there about, with the end of your thumb, about an inch in diameter? A. I judge that, yes; that's the main bone down in the leg.

"Q. The big bone of the leg? A. Yes, sir, sticking out through the flesh of the leg. I had to bend the leg up and push the bone down in there so I could sew the wound up.

"Q. All these injuries were so severe it would be impossible for you to tell which one caused his death, would it? A. Oh, yes. The lick on the head would have killed him, no doubt. Of course, if he had got to the hospital, this wound here wouldn't have killed him, if they got him there in time.

"Q. But the head was crushed in? A. Yes, his head was crushed, no doubt that is what killed Mr. Davis; but his chest was crushed, too."

All of the witnesses were introduced by the plaintiff. The defendant offered no evidence.

It is seen that the only evidence as to the manner in which the "accident" occurred are the statements of defendant Sam Henderson to the witnesses E. Gray Smith, J. M. Murray, and W. H. Thornton. These statements were competent evidence against defendant Sam Henderson as admissions against interest; and no objection to their introduction, or request that they be limited to the suit against Sam Henderson, was made on behalf of defendant Smith. See Smith v. Fisher, 11 Tenn. App., 273, 286.

However, in considering the proven statements of Sam Henderson, it must be borne in mind that "every admission upon which a party relies is to be taken as an entirety of the fact which makes for his side, with the qualifications which limit, modify, or destroy its effect on the other side. This is now a settled principle which has passed, by its universality, into a maxim of the law." Jones on Evidence (2 Ed.), vol. 3, pp. 1957, 1958, sec. 1063.

This rule "requires that what is in favor of the party making the admissions should be fairly and liberally considered and weighed with the other evidence." Id., p. 1962, sec. 1065.

An automobile is not a "dangerous instrumentality," as that term is used in the law of negligence. The rule of res ipsa loquitur is not applicable in this case.

In order to justify the submission of a case of this character to the jury, over a motion of the defendant for a directed verdict, there must be some material evidence reasonably tending to support each and all of three propositions, viz.: (1) A duty which the defendant owes to the plaintiff; (2) a negligent breach of that duty; and (3) injuries received thereby resulting approximately from such negligent breach of duty. DeGlopper v. Nashville Railway & Light Co., 123 Tenn., 633, 642, 643, 134 S. W., 609, 33 L. R. A. (N. S.), 913.

It is argued for plaintiff that defendant Sam Henderson's admission, that he did not see the deceased until the latter was on the hood of the truck Henderson was driving, proves that he was not maintaining a proper lookout ahead. This would be a sound proposition if there were proof that Davis appeared in front of the truck at such distance and in such position that he could have been seen by Henderson if the latter was exercising proper vigilance (Louisville & N. Railroad Co. v. May, 5 Tenn. App., 100); but there is no such evidence. The first time and place the deceased was seen on the night of his death (so far as this record shows) he was on the top of the hood of defendants' truck. Whence he came or whither he intended to go does not appear. Any finding by the jury that the death of L. P. Davis was proximately caused by negligence of defendant Sam Henderson would necessarily be based on speculation and conjecture.

It would not be inconsistent with the facts in evidence to suppose that L. P. Davis was struck by another automobile and thrown on the hood of Smith's truck, as defendant Sam Henderson suggested. But, if the supposition just stated be rejected, and it be assumed that deceased while on the ground, was struck by the front of defendant Smith's truck, it would not be inconsistent with the facts in evidence to suppose that the deceased stepped in front of the truck an instant before he was struck, and too late for Sam Henderson to have stopped before striking him if he had seen him. These are mere conjectures, but they are as consistent with the proven facts as the supposition that the proximate cause of the death of L. P. Davis was negligent conduct of the defendant, as charged in the plaintiff's declaration. A verdict cannot be based on conjecture. Buckeye Cotton Oil Co. v. Campagna, 146 Tenn., 389, 396, 242 S. W., 646; Chicago, etc., Railroad Co. v. Coogan, 271 U. S., 472, 473, 478, 46 S. Ct., 564, 566, 70 L. Ed., 1041, 1045; Patton v. Texas & P. Railway Co., 179 U. S., 658, 663, 21 S. Ct., 275, 45 L. Ed., 361, 364; Pennsylvania Railroad Co. v. Chamberlain, 288 U. S., 333, 344, 53 S. Ct., 391, 395, 77 L. Ed., 819, 825; Hart v.

Union City, 107 Tenn., 294, 64 S. W., 6; Pryor v. Cincinnati, etc., Railway Co., 2 Tenn. Civ. App., 198; Virginia & S. W. Railway Co. v. Hawk, 6 Cir., 160 F., 348; Williams v. Southern Railway Co., 130 N. C., 116, 40 S. E., 979; Hughes v. Cincinnati, etc., Railway Co., 91 Ky., 526, 16 S. W., 275; Louisville & N. Railroad Co. v. Dillehay, 3 Tenn. App., 476; Standard Oil Co. v. Roach, 19 Tenn. App., 661, 94 S. W. (2d), 63.

It results that plaintiff's assignments of error are overruled, and the judgment of the circuit court, dismissing plaintiff's suit at his cost, is affirmed.

The costs of the appeal will be adjudged against plaintiff John Nichols, as administrator as aforesaid.

Crownover and Felts, JJ., concur.

### On Petition for Rehearing.

FAW, P. J. ▉▉ On a former day of the present term of this court, an opinion was filed, and judgment entered in this cause, affirming the judgment of the Second circuit court of Davidson county, which directed a verdict for the defendants, and dismissed the action of the plaintiff John Nichols, administrator of the estate of L. P. Davis, deceased. A petition for a rehearing of the case and a reversal of our former opinion and judgment has been filed on behalf of the plaintiff administrator. The contention of the petitioner, urged in his well-prepared and forcibly phrased petition, is that this court, in our former opinion in this case, "omitted to apply or even mention . . . the presumption that the deceased was in the exercise of ordinary care at the time of the injury that caused his death," and that "this presumption, under the facts of this case, was sufficient to present a jury issue."

The rule of law which plaintiff thus seeks to invoke is well established. Where negligence of the deceased, proximately contributing to his injuries and death, does not appear from the proof adduced by the plaintiff, the burden to show its existence rests upon the defendant; and where a person is killed by an accident to which there are no eyewitnesses, the presumption of law, in the absence of evidence tending to show the contrary, is that he was in the exercise of due care for his own safety. Tennessee Central Railway Co. v. Herb, 134 Tenn., 397, 401, 183 S. W., 1011; Tennessee Central Railway Co. v. Melvin, 5 Tenn. App., 85, 98; Louisville & N. Railroad Co. v. Frakes and Payne, 11 Tenn. App., 593, 608; Jones on Evidence (2 Ed.), 1926, vol. 1, sec. 257.

It is true that no mention of the aforesaid presumption of due care was made in our former opinion in the instant case. This was not by oversight, but for the reason that there was no evidence tending to show that the deceased was guilty of negligence which proxi-

mately caused or contributed to his injuries and death, and the record discloses no claim or contention by or on behalf of the defendants, either in the trial court or in this court, that he was thus negligent. The sole issue was, whether or not defendant Sam Henderson was guilty of actionable negligence which was the proximate cause of the death of plaintiff's intestate, it appearing, without dispute, that if defendant Sam Henderson was thus liable, his codefendant, E. Gray Smith, was liable also under the doctrine of respondeat superior. There was, therefore, no occasion to discuss the "presumption of due care" in the opinion.

It is, in substance, said in the petition, that certain statements in our former opinion disclose a failure to recognize and apply the "presumption of due care" on the part of the deceased. Near the close of our former opinion, we said:

"It is argued for plaintiff that defendant Sam Henderson's admission that he did not see the deceased until the latter was on the hood of the truck Henderson was driving, proves that he was not maintaining a proper lookout ahead. This would be a sound proposition if there was proof that Davis appeared in front of the truck at such distance and in such position that he could have been seen by Henderson if the latter was exercising proper vigilance (Louisville & N. Railroad Co. v. May, 5 Tenn. App., 100); but there is no such evidence. The first time and place the deceased was seen on the night of his death (so far as this record shows) he was on the top of the hood of defendants' truck. Whence he came or whither he intended to go does not appear. Any finding by the jury that the death of L. P. Davis was proximately caused by negligence of defendant Sam Henderson would necessarily be based on speculation and conjecture.

"It would not be inconsistent with the facts in evidence to suppose that L. P. Davis was struck by another automobile and thrown on the hood of Smith's truck, as defendant Sam Henderson suggested. But, if the supposition just stated be rejected, and it be assumed that deceased, while on the ground, was struck by the front of defendant Smith's truck, it would not be inconsistent with the facts in evidence to suppose that the deceased stepped in front of the truck an instant before he was struck, and too late for Sam Henderson to have stopped before striking him if he had seen him. These are mere conjectures, but they are as consistent with the proven facts as the supposition that the proximate cause of the death of L. P. Davis was negligent conduct of the defendant, as charged in the plaintiff's declaration. A verdict cannot be based on conjecture." (Citing a number of authorities.)

The criticism is particularly directed to the statement in the foregoing quotation that "It would not be inconsistent with the facts in evidence to suppose that the deceased stepped in front of

the truck an instant before he was struck, and too late for Sam Henderson to have stopped before striking him if he had seen him.''

We can readily understand how the brief statement last quoted, *standing alone,* might be interpreted as a disregard of the ''presumption of due care'' on the part of the deceased; but, when read with the context, it is seen that we were merely attempting to illustrate the proposition that a verdict for plaintiff ''would necessarily be based on speculation and conjecture,'' by stating certain ''conjectures'' which, we thought, were as consistent with ''the *proven* facts'' as the supposition that the proximate cause of the death of plaintiff's intestate was negligent conduct of the defendant Sam Henderson, *''as charged in the plaintiff's declaration.''*

The negligence ''charged in the plaintiff's declaration'' was that ''L. P. Davis, was negligently, carelessly, recklessly and unlawfully knocked down and run over by the automobile truck above described;'' that ''the driver, Sam Henderson, . . . was driving said truck at a negligent, reckless and unlawful rate of speed under the circumstances, was not keeping a proper lookout ahead, did not have his said truck under control, and while thus driving in such an unlawful manner caused his truck to be driven into and against plaintiff's deceased *while he was proceeding across the pike in plain, open and unobstructed view* had the defendant been in the exercise of ordinary care.'' (Italics ours.)

We assume that it is not necessary to cite authorities to support the proposition that the proof must correspond with the allegations in the pleadings, and that a plaintiff may not allege one state of facts and recover upon another and different state of facts. Hence, in the endeavor to ascertain whether or not there is any material evidence to support a verdict that *defendant Henderson was negligent as charged in the declaration,* it is permissible, as an illustration of the speculative character of any verdict for plaintiff, to consider the *equal* consistence of ''the proven facts'' with two or more theories, where the defendant would not be liable under one or more of such theories, although he would be liable under one or more, but not all, of them. (See cases cited in our former opinion in this case.)

It is well said in the reply of defendants to the petition of plaintiff to rehear that, ''the recognition and the application of the presumption that the deceased was in the exercise of ordinary care for his own safety, does not stand as a witness for the plaintiff to the effect that the defendant was negligent. A recognition of this rule does not shift the burden of proof to the defendant. A recognition of this rule does not take the case out of the rule that the jury will not be allowed to speculate and reach a conclusion based on inferences and surmises that the defendant was guilty of negligence.''

In his petition, the plaintiff seeks to invoke section 2687, subsection (c) of the Code, which provides that ''The driver of any vehicle upon a highway within a business or residence district shall yield the right of way to a pedestrian crossing such highway within any clearly marked crosswalk or any regular pedestrian crossing included in the prolongation of the lateral boundary lines of the adjacent sidewalk at the end of a block, except at intersections where the movement of traffic is being regulated by traffic officers or traffic direction devices. Every pedestrian crossing a highway within a business or residence district at any point other than a pedestrian crossing, crosswalk, or intersection shall yield the right of way to vehicles upon the highway.''

No reference to this statute was made in the briefs heretofore filed in this cause, and we do not think the evidence is sufficient to bring this case within the terms of this statute, which applies only ''within a business or residence district.'' The proof shows that the accident here in question occurred on the Gallatin pike, at Leland avenue, just outside the city limits of Nashville; but there is no evidence that this place is ''within a business or residence district.''

In the petition it is said:

''Admittedly the deceased was struck by the front portion of defendant's truck.''

It was admitted that the deceased ''landed'' on the hood of defendant's truck, and struck, or was struck by, the windshield; but if by ''the front portion of defendant's truck'' petitioner means that part of the truck which would first strike a man standing or walking on the ground in front of the truck, this was not admitted but was a controverted issue; and the fact that no damage was done to any part of the truck except the windshield, when considered in connection with the condition of the body of the deceased (as described in our former opinion), tends to support the conclusion that deceased was not struck by the front of defendant's truck. The circumstances in evidence are more consistent, in our opinion, with the idea suggested by Sam Henderson, that the deceased was struck by a passing car going north and thrown upon the hood of defendant's truck.

Again it is said in the petition:

''To run down a pedestrian at an intersection without seeing the pedestrian before the truck strikes him raises a presumption that the driver was not keeping a proper lookout ahead or did not have his car under proper control or that his headlights were not burning, or that his brakes were out of condition, or that the driver's attention was distracted, or that he was half asleep, etc.''

The statement just quoted overlooks the fact that there are neither averments nor proof that the headlights of defendant's truck were not burning, or that his brakes were out of condition, or that the

494

driver was half asleep; and negligence in these respects cannot be presumed. Smith v. Fisher, 11 Tenn. App., 273, 291. Negligence may not be inferred in a case of this character from the mere fact of the injury. De Glopper v. Nashville Railway & Light Co., 123 Tenn., 633, 643, 134 S. W., 609, 33 L. R. A. (N. S.), 913.

The petition for a rehearing is denied and dismissed at the cost of the petitioner.

Crownover and Felts, JJ., concur.