# SHELTON v. CITY OF MEMPHIS.
## —222 S. W. (2d) 681.

Western Section.　March 23, 1949.

Petition for Certiorari denied by Supreme Court, June 18, 1949.

Harsh, Pierce, Cochran & Rickey, of Memphis, for plaintiff in error.

Frank Gianotti, Jr., and Charles M. Crump, both of Memphis, for defendant in error.

ANDERSON, P. J.   James Henry Davis, a common laborer in the employ of the City of Memphis, was fatally injured when he was struck by the heavy steel boom of a crane, which fell while the crane was being operated by another servant of the City.   His children brought this suit for damages for the wrongful death of their father. There was a directed verdict for the defendant and the plaintiffs appealed in error.   A number of interesting questions have been ably presented and elaborately briefed by counsel for the respective parties.   We have found especially helpful the form and discriminating particularity with which counsel have briefed for our assistance the propositions of fact and law upon which they rely.

The declaration is in five counts.   The first charged the doctrine of res ipsa loquitur.   The second charged negligence of the defendant in failing to make a proper inspection of a machine.   The third charged the failure of the defendant to provide an operator of sufficient skill and experience to properly operate the crane.   The fourth charged that the crane was not suited to the par-

ticular work for which it was being used at the time, and that such use constituted negligence. The fifth charged that the crane was an inherently dangerous machine and the defendant failed to give the deceased adequate warning and instructions as to the proper precautions to be taken in working near it.

The verdict as to the third count was directed at the conclusion of the plaintiff's evidence, and no error is assigned on that action. The verdict as to the other counts was directed at the conclusion of all the evidence, and the errors assigned go to that ruling.

The crane was owned by the Hawkins Equipment Company and had been rented from that concern by the City for use by its construction crew in the repair and reconditioning of a bridge across Cypress Creek on Bellevue Street in Memphis. In the course of this work it became necessary to pull out two bulkhead pilings which were embedded in the ground to support the fill at the end of the bridges. The crane was to be used for this purpose. The accident occurred on the first attempt to remove one of these pilings.

The crane was a new one, of a truck-type known as the Insley K-14. A platform on the truck contained the apparatus by means of which the crane was operated by a man sitting in a cab on the platform. The boom was 30 to 40 feet in length and extended outward from the platform of the truck. The crane was operated by means of three cables. One held the boom up, another raised and lowered a hook attached to its end, and a third opened and closed a clam shell when that device was being used, which was not the case on the occasion in question.

In removing the piling, the boom was not raised or lowered but held stationary at an angle of about 45°.

The piling was pulled upward by means of a "lifting line" or cable which ran from the mechanism on the truck down the length of the boom. It had a hook, or shackle bolt on the end of it to be attached to a chain wrapped around the piling. The cable which held the boom up was about one-half inch in diameter. It was anchored by means of a wedge inserted in a tapered socket welded to the side of the operator's cable. The cable was encased in the socket in the form of a horseshoe loop enclosing a tapered wedge. The end of the cable extended a short distance from the socket and was loose. As a result of this arrangement, when force was exerted on the cable by reason of the downward pull on the boom in the lifting process, the wedge tightened in the socket, thus making the cable fast, if, but only if, the wedge was of the proper size so that it did not pull through the socket. Before entering the socket, however, the cable passed around an iron bar to the rear of the point where the socket was located, so that the small end of the socket and the wedge therein were pointed in a direction opposite that in which the boom extended.

On the occasion in question there were two pilings to be pulled. These were 12 to 18 inches in diameter and firmly embedded in the bottom of a ditch or creek over which the bridge crossed. The crane was stationed at or near the end of the bridge, with the boom extending at an angle across one corner of it. Just prior to the accident one of the crew standing in the bottom of the ditch had wrapped a chain around the piling which was to be pulled out and to this had attached the hook on the end of the lifting cable. This employee was out of the view of the crane operator and another employee was stationed at point where he could signal the operator to

begin the lifting operation. Upon this signal being given, the operator put the crane to work and "got about two pulls on it when the boom fell". As said, the boom extended from a truck at about a 45° angle. The force applied in the attempt to pull the piling by means of the lifting cable exerted a downward pressure on the boom, which in turn put a strain on the holding cable anchored by means of the wedge in the socket as above described. Following the accident a wedge bearing the imprint of a cable was found about 70 feet from the crane in the direction in which the small end of the socket pointed. Upon being tested, it was found that this wedge was too small and as a result would slip through the socket when sufficient force was exerted upon the holding cable, which a wedge of proper size would not do. Another wedge was found inside the cab. When tried in the socket, it did not slip through and was used to reassemble the crane after the accident, although there appears to have been no further attempt to pull the particular pilings with this machine.

As said, the crane was new, having been purchased from the manufacturer by the Hawkins equipment Company but a short time before the accident. It had been assembled by the owner before it was turned over to the City and was apparently ready for use. Whether the owner knew it was to be used for pulling piling does not appear.

On the day before the accident the defendant had used the crane to remove dirt with a clam shell, without discovering any defect in the mechanism. But, as stated, no prior attempt had been made to use it to pull out embedded piling, and no investigation or inspection was made by the City to discover whether the crane was as-

sembled in a manner that would permit it to be used for that purpose with safety.

It was the defendant's contention that as a result of the force applied in attempting to remove the piling, the wedge was pulled through the socket and the holding cable thus released from its anchorage, allowing the boom to fall; that the failure of the anchorage device to function was due to the fact that the wedge was too small and that this was a latent defect which could not have been discovered by a reasonable inspection.

The plaintiffs introduced two witnesses, officials of the Hawkins Equipment Company which owned the crane, and their testimony was that this type of crane was not designed and constructed and was not suitable for that purpose; that in any case where pilings were pulled by that type of crane extra precautions should be taken. Another expert testifying for the plaintiff said that the smallest size crane which should be used to pull pilings was one of a yard capacity; (the crane in question was but a half yard capacity); that if a crane of half yard capacity were used for that purpose, it should be staked down to the ground and a clamp placed upon the end of the cable below the anchor assembly to prevent the cable's being pulled through suddenly in the event it slipped, so as to give the operator some warning should the crane be overloaded.

Further expert testimony for the plaintiffs, regarded in the light most favorable to them, is accurately summarized in the plaintiff's brief as follows:

"1. If the wedge in the cable anchor assembly were too small only very slight pressure would be necessary to pull the wedge through the socket, thus releasing the cable, and that the weight of a shovel upon the lifting

end of the boom, the weight of a few planks, or the weight of the boom itself, would create an amount of pressure sufficient for this purpose.

"2. If a lift beyond the capacity of the machine was attempted, then either the cable would break or some other part of the machine would give way; or the engine would be killed; or the crane would be pulled over and down towards the object of the lift; or the end of the cable which supports the boom would slip around the wedge which anchors it, and thus the cable would be released and the boom would fall suddenly.

"3. A good operator could tell in his inspections whether or not the wedge used as part of the cable anchoring assembly was the proper size, or close enough to the proper size to be safe if the machine were used properly."

We think that, to say the least of it, the evidence, viewed in the light most favorable to the plaintiff, made it highly doubtful whether the defendant could properly be adjudged not guilty of negligence as a matter of law, particularly with respect to the question of whether the defendant was using the machine for a purpose for which it was not adapted and not intended to be used, and whether the defendant made the necessary investigation to determine if it could be safely used for that purpose. But it is not necessary to decide that question, because we think the undisputed facts show the action was barred by the contributory negligence of the deceased.

Just prior to the accident, the foreman was with the member of the crew who was down in the bed of the creek or ditch, engaged in hitching the chain around the piling and attaching to it the lifting cable. This being done, the

foreman proceeded to the truck to get a drink of water from the water cooler which was on the running board. The operation began while he was quenching his thirst. Having done this, the foreman climbed up in the cab and directed his attention on the boom. As it fell, he followed it downward with his eyes and for the first time saw the deceased standing almost underneath it.

As the lifting process began and progressed, the attention of the operator of the crane was centered on another employee who was stationed at a point where he could signal directions to begin the operation. This seems to have been necessary, because the point at which the cable was hooked to the chain around the piling was below the level of the bridge and out of the operator's view. The latter said he saw the deceased "a couple of seconds before the thing hit him"; that the boom did not "fall straight down but at an angle, a little to the left."

In addition to a general instruction or rule that members of the construction crew should stay clear of the crane when it was in use, the foreman testified that on the particular morning prior to the accident, he twice specifically warned the crew of the danger involved in the operation about to be undertaken. On the first occasion, after the nature of the work to be done became apparent to the crew, he reiterated the general warning to stand clear of the crane while it was in operation. The second warning, was given just as the chain was being put around the piling. On this occasion, the foreman "told them to stand back and be sure to stand out of the way". . . that, "if the chain was to happen to break upon that bridge, it might cut their heads off". This testimony of the foreman was not disputed, nor was he in any way impeached.

At the time of his death, the deceased was 58 years of age, fairly active physically, in good health, and with no impairment of his faculties so far as appears. He had been a member of the city's bridge construction crew for nearly three years prior to the accident. While he had nothing to do with the operation of cranes, these machines were frequently employed on the work in which he was engaged in the capacity of common laborer, and presumably he knew in general how they operated.

He had no duty to perform in connection with the particular operation in the course of which the boom fell, and in fact was engaged in no work of any kind at that time. He was a mere spectator. Knowing that the operation was about to begin, instead of heeding the warning given by the foreman, he left a place of safety and took a position on the edge of the bridge about two and a half or three feet from a point directly beneath the boom. Apparently through idle curiosity, he did this in order to get in a better position to watch the attempt to pull out the embedded piling.

The applicable principle of law is that a servant who ignores a warning that a particular situation or operation is dangerous does so at his own risk. If injured as a result, he must be regarded as the author of his own misfortune. So, if he unnecessarily places himself in a dangerous position and his doing so is the proximate cause of his injuries, he can have no recovery. 35 Am. Jur. 703, 56 C. J. S., Master and Servant, Section 445, page 1264.

In Louisville & Nashville R. Co. v. Wilson's Adm'r, 88 Tenn. 316, 12 S. W. 720, a recovery was denied for the death of one of a crew operating a railway train which occurred in a collision caused by the negligence of

the engineer in charge of the other train. The ground of the decision was that in violation of the known rules of the company the deceased had voluntarily and needlessly left his post of duty and sought a more exposed and dangerous position on the train, whereas if he had remained at his own place of duty he would not have been injured.

A similar conclusion was reached in Buckner v. Southern R. Co., 20 Tenn. App. 212, 96 S. W. (2d) 600. In that case the deceased, who had been employed by the railway as a pipe fitter's helper in one of its yards, had stationed himself on the extreme rear of an engine which was backing in the direction of his home. He was killed when the engine collided with another engine being backed in the opposite direction. It was held that an action for his death was barred by the negligence of the deceased in riding the tender of the engine in violation of the rules of the company, and in the face of a known and appreciated danger.

The same result was reached in Kansas City, Memphis & Birmingham R. Co. v. Williford, 115 Tenn. 108, 88 S. W. 178, on an analogous state of facts. The ruling was that a servant injured while riding on the tender of a backing engine and not engaged in the performance of any duty, was guilty of proximate contributory negligence as a matter of law.

In Tennessee Copper Co. v. Simpson, 6 Tenn. Civ. App. 536, a recovery for the wrongful death of a deceased servant was held barred by the contributory negligence of an experienced miner in disregarding a rule of his employer, compliance with which would have preserved his life.

A pertinent case from another jurisdiction is that of Brickell v. Shawn, 175 Va. 373, 9 S. E. (2d) 330, 332. There

the deceased was killed when the supporting structure of a sign being erected by the master on the roof of a building collapsed and knocked him or caused him to fall to the street from the top of the parapet on which he was standing. He was employed as a helper in the erection of the sign by the master and his duties required him to be on the roof of the building which was flat, wide and safe. Being under no obligation to do so, he left this place of safety, and went to a place of peril on top of the narrow wall from which he fell and where he had been fully warned not to go. In holding that a recovery was barred as a matter of law, the Court said:

"It is undisputed that at the time of the accident Shawn was performing no duty which required him to be on top of the wall. He had been positively warned not to go there. Likewise, he had been warned to stay clear of the structure (the sides of which were being erected), and yet, notwithstanding this, he left a place of safety on the flat roof, where his duties required him to be, caught hold of the structure and pulled himself up on top of the narrow wall. When the structure collapsed he was knocked or fell to the pavement below. Clearly, we think, he was the author of his own passing."

See also: Barger v. Oswalt, 239 Ala. 289, 194 So. 884; Faulkner v. Gatliff Coal Co., 228 Ky. 379, 15 S. W. (2d) 236; New York Cent. R. Co. v. Ambrose, 280 U. S. 486, 50 S. Ct. 198, 74 L. Ed. 562.

Other cases to the same effect could be cited but this is deemed unnecessary.

We think there is no escape from the conclusion that the death of the deceased was due to his own fault. The fact that the particular contingency mentioned by the foreman in his second admonition did not occur is not

384

material in a determinative sense. The risk which resulted in the fatal injury was within the scope of the warning. The determinative fact is that the deceased was fully advised of the danger in standing near the boom while the crane was in operation and voluntarily incurred the risk of so doing.

The plaintiffs argue that they are entitled to the benefit of the presumption that the deceased was in the exercise of ordinary care. This, we think, is a misconception as applied to the facts of the present case. There is no room for such a presumption where the pertinent facts with respect to that issue are shown by evidence. Frank v. Wright, 140 Tenn. 535, 205 S. W. 434; Southern Motors Inc. v. Morton, 25 Tenn. App. 204, 154 S. W. (2d) 801; Illinois Central R. Co. v. H. Rouw & Co., 25 Tenn. App. 475, 159 S. W. (2d) 839; Nichols v. Smith, 21 Tenn. App. 478, 111 S. W. (2d) 911.

Where this is true the presumption cannot be used to contradict the material evidence on the issue for the purpose of making a jury question. Ibid.

The result is that the judgment is affirmed at the cost of the plaintiffs-in-error.

Baptist and Swepston, JJ., concur.