NELSON v. RURAL EDUCATIONAL ASS'N et al.—134 S. W. (2d) 181.

Middle Section.    September 23, 1939.

Petition for Certiorari denied by Supreme Court, December 16, 1939.

Thomas G. Watkins, of Nashville, for plaintiff in error Nelson.

Trabue, Hume & Armistead and Bass, Berry & Sims, all of Nashville, for defendant in error Association.

FAW, P. J.  On May 5, 1938, George L. Nelson, the plaintiff below (and hereinafter called plaintiff), sued The Nashville Agricultural & Normal Institute, Rural Educational Association, and The Layman Foundation, to recover damages in the sum of twenty-five thousand dollars, for injuries to his person, and thereafter, on October 3, 1938, filed his declaration in which he averred, among other things, that one Lloyd Levison, an agent and employee of the defendants, while engaged within the scope of his said employment, under circumstances stated in the declaration, negligently, carelessly and wrongfully struck plaintiff upon the chin or jaw and thereby inflicted serious, painful and permanent injuries upon the person of plaintiff, which alleged injuries are set forth and described in the declaration.

The three defendants interposed two joint pleas to the declaration, which may be described as (1) a plea of not guilty, and (2) that said Lloyd Levison committed the alleged assault and battery in his own necessary self-defense.

At the beginning of the trial below (on December 2, 1938), the plaintiff, by leave of the Court, took a voluntary nonsuit as to the defendants The Nashville Agricultural & Normal Institute and The Layman's Foundation, and the case proceeded thereafter against Rural Educational Association, a domestic general welfare corporation, as the sole defendant (which we will hereinafter designate as defendant, or as the Sanitarium, as it was stipulated of record below that The Rural Educational Association ordinarily operated under the "trade name" of Madison Rural Sanitarium and Hospital, and it is frequently mentioned in the record as The Sanitarium).

It should be stated, however, that no claim has been interposed by defendant, either in the trial Court or this Court, that the defendant is exempt from liability because it is chartered and organized as a non-profit, general welfare corporation.

At the close of plaintiff's proof in chief, the trial Court, on motion of the defendant, directed the jury to return a verdict in favor of the defendant, which was done, and the plaintiff's suit was dismissed at his cost.

In due season, the plaintiff filed a motion for a new trial, which was overruled, and thereupon plaintiff excepted and prayed an ap-

peal in error to this Court, which was granted by the trial Court, and plaintiff perfected his appeal by seasonably filing the oath prescribed for poor persons and a bill of exceptions.

In this Court the plaintiff has filed assignments of error numbered one to nine, both inclusive, but, by necessary implication, the first seven assignments are embraced in the eighth assignment, through which the plaintiff asserts that "the action of the Court in sustaining the motion of the defendant that the jury be peremptorily instructed to return a verdict for defendant . . . was error."

The ninth assignment complains of the exclusion by the trial Court of certain testimony of the plaintiff's witness, Miss Lela Rice. Aside from the question of evidence presented by the ninth assignment of error (which will be considered later herein), the sole question arising on the record is, as stated in plaintiff's brief, "whether the trial Judge acted properly in taking the case from the jury."

The plaintiff seeks to invoke the rule repeatedly declared by our Supreme Court that, "there can be no constitutional exercise of the power to direct a verdict in any case in which there is a dispute as to any material evidence or any legal doubt as to the conclusion to be drawn from the whole evidence, upon the issues to be tried," and plaintiff contends that, in this case, "the testimony presents clearly matters which only the jury may determine, and the trial Judge stepped beyond his constitutional power in directing a verdict for the defendant in error." On the other hand, it is insisted for the defendant that the action of the trial Judge in directing a verdict for defendant was "fully justified and should be affirmed."

Counsel for the respective parties apparently differ with respect to the plaintiff's cause of action. Plaintiff's counsel seems to proceed, in his brief and argument, upon the theory that the gravamen of plaintiff's action is negligent failure of defendant Sanitarium to exercise that degree of care and attention for plaintiff's safety that plaintiff's physical and mental condition required under the then existing circumstances.

Defendant's counsel proceed, in their reply to the assignments of error, upon the theory that "this is an action for assault and battery."

"One can only determine the purpose of a suit from the pleadings." Union Tanning Co. v. Lowe, 148 Tenn., 407, 412, 255 S. W., 712, 713. We, therefore, quote plaintiff's declaration in full, as follows:

"The plaintiff, George L. Nelson, sues the defendants, The Nashville Agricultural and Normal Institute, Rural Educational Association and The Layman Foundation, for Twenty-five thousand ($25,000.00) dollars damages for personal injuries which said defendants inflicted upon him on or about December 10th, 1937, and for cause of action says:

"That on or about December 10th, 1937, and for a long time prior

thereto, the said defendants were and are corporations duly organized, chartered and existing under and by virtue of the laws of the State of Tennessee, with their principal offices and places of business at or near Madison, Tennessee, and were engaged in the operation of a sanitarium or hospital known as Madison Rural Sanitarium situated at or near Madison, Davidson County, Tennessee, at which hospital or sanitarium patients were received at a certain price to be paid weekly or monthly by said institution and furnished a room or rooms, medical attention, food, nurses and attendants.

"That during the year 1937 and prior to the infliction upon plaintiff of the injuries hereinafter complained of, plaintiff from time to time had been received as a patient by defendants at its said institution, namely Madison Rural Sanitarium, where he was treated for a condition resulting from the use to excess of whiskey or gin, or both, and to be cured of his desire for alcoholic liquors.

"That shortly prior to December 10th, 1937, plaintiff was received by said defendants at its said institution, that is to say, Madison Rural Sanitarium, as a patient that his physical condition might be improved in order that he might undergo at said institution an operation for hemorrhoids, from which he had for years suffered. That while such a patient of said defendants at said Madison Rural Sanitarium and being treated and cared for by them that his said physical condition might be improved in order to undergo said operation, plaintiff was given whiskey by a patient also in said institution and became intoxicated.

"That on or about December 10th, 1937, while plaintiff was intoxicated, said defendants assigned one of its agents and employees, to-wit: Lloyd Levison, to attend and care for plaintiff and while plaintiff was in a state of intoxication. That while so attending plaintiff who was then and there intoxicated the said Lloyd Levison negligently, carelessly and wrongfully struck plaintiff upon the chin, or jaw, plaintiff giving him no cause for striking plaintiff, and fracturing both jaw bones of plaintiff causing plaintiff to suffer excruciating physical pain, agony and mental anguish, causing plaintiff, to incur large expense on account of necessary services rendered to him by surgeons, dentist and physicians, as well as for medicines. That as a result of said injuries and in treating plaintiff for same it was necessary that plaintiff's jaw bones be wired together and his mouth tightly closed with wires. That because of said injuries an infection resulted adding to plaintiff's pain and suffering necessitating an unwiring of said bones that such infection might be treated and a rewiring of same again closing his mouth tightly with wires and in the further course of treating such infection it was necessary to make an incision in plaintiff's neck near plaintiff's chin and below the jaw bone, and as a consequence of such necessary treatment, in addition to the pain and suffering, plaintiff is permanently scarred and disfigured. That due to said injuries plaintiff's teeth will have to be

extracted when his jaw bones have knit and the union such as to permit the removal of plaintiff's teeth.

"Wherefore, plaintiff sues the defendants and demands a jury to try the cause."

As before stated, the defendant pleaded the general issue—not guilty—and also a plea of self-defense. Where self-defense "is properly pleaded, together with the plea of not guilty, the latter plea puts the plaintiff upon proof of every material allegation in the declaration." Cogdell v. Yett, 1 Cold., 230, 232.

We are inclined to the opinion that the declaration states a cause of action for assault and battery alone, and the averments immediately following the first paragraph and preceding the paragraph in which the assault and battery upon plaintiff by Lloyd Levison and the resulting injuries to plaintiff are averred, merely serve to define the relations between the parties at the time the alleged assault and battery was committed, and otherwise they are simply matters of inducement. We find no averment in the declaration of a failure on the part of defendant to discharge its full duty toward plaintiff as a patient in its hospital, or of any wrongful or tortious act of an agent or employee of defendant resulting in injury to the plaintiff, except the averment that defendant's agent and employee, Lloyd Levison, "negligently, carelessly and wrongfully struck plaintiff upon the chin or jaw," etc.

However, we have carefully examined all the evidence in the record with the aforesaid theory of each of the parties in mind, and we will undertake to determine whether or not the trial Court erred in directing a verdict for defendant upon either of the two interpretations of the declaration.

The plaintiff, George L. Nelson, was forty years of age at the time of the trial below. He was born, and has lived practically all of his life, in Nashville, Tennessee. He was employed from the year 1916 to December, 1936, by the Standard Sanitary Manufacturing Company. He was first employed as assistant bookkeeper at a salary of $25 per month, and was thereafter successively bookkeeper, cashier and claim clerk, salesman, and credit manager, in which latter position he received a salary of $187.50 per month, plus an annual bonus ranging from $125 to $300. He held the position of credit manager as aforesaid for about eight years, but during that period he acquired the habit of using intoxicating liquors to excess, and, as a result, was discharged by his said employer in December, 1936. He continued to drink to excess and did not secure other employment, although he attempted to do so.

Throughout the succeeding two years, or a little less, he was treated (first at City View Sanitarium in or near Nashville, and thereafter, for ten or twelve different periods, at defendant's Sanitarium) for chronic alcoholism, at the expense of his aunt, Miss Lela Rice, a teacher in the State College for Women at Montevallo, Alabama.

On November 28, 1937, plaintiff voluntarily entered defendant's Sanitarium, but not for treatment as an "alcoholic" patient, for he was sober at that time and went to defendant's Sanitarium "to be built up for a hemorrhoid operation."

In order that the precise import of plaintiff's testimony may be seen, we quote excerpts therefrom pertaining to what we regard as the most material aspects of the case, as follows:

"Q. Mr. Nelson, when was it that you went to Madison Sanitarium, as I will term it, the last time? A. November 28th.

"Q. What year? A. 1937.

"Q. Now, Mr. Nelson, what was your condition at the time your went to the institution on November 28th, 1937? A. Well, I was perfectly sober. I hadn't had a drink for possibly ten days. I had had those two cases pending against me. I had been arrested for those two times for driving while drunk, and I was all to pieces, nervous and run down and very weak, and went out there to be built up for a hemorrhoid operation.

"Q. Have you suffered from that trouble, hemorrhoids you spoke of, for any length of time? A. For several years, yes sir.

"Q. Now, who arranged to incur the expense, to be responsible for the expense, of your being at the institution on this particular occasion when you went out there on November 28th, 1937? A. Miss. Rice.

"Q. Mr. Nelson, when did you eventually leave Madison, if you recall? A. I think it was May 12th.

"Q. Of what year? A. 1938.

＊　＊　＊　＊　＊　＊

"Q. And the purpose of going on that occasion was that your physical condition might be improved to undergo this operation, is that correct? A. That is right.

"Q. I will ask you, Mr. Nelson, if at any time after going out there on this last occasion you became intoxicated? A. I did.

"Q. Now, with reference to going out there, which, I believe you said on November 28th, 1937, about when was it that you became intoxicated again? A. Well, I would say the 8th or 9th of December.

"Q. Just how did that come about, Mr. Nelson? A. Well, there were four or five alcoholic patients there and naturally we got around and talked among ourselves and the more you talk about a thing of that sort the greater it becomes and finally a couple of them gave me, one of them gave me some beer and one of them gave me some whiskey, and then I proceeded to go off and get some of my own accord.

"Q. I believe you said there were several other alcoholics you were talking to? A. Yes sir, four or five, as I recall, at that particular time.

"Q. Does the defendant institution treat alcoholics? Is that part of what they offer out there? A. That is part of the treatment.

"Q. I mean, treat patients suffering from over-indulgence in alcoholic liquors, is that right? A. That is right.

"Q. What would you say was your condition as to being intoxicated; that is, slightly intoxicated, or very much intoxicated on this last occasion, Mr. Nelson? A. Why, I was very much intoxicated.

"Q. You say that was about the 8th, or 9th, of December? A. That is when I started drinking but it was the 10th of December—

"Q. Now, you went out there, I believe you said, on the 28th, of November? A. That is right.

"Q. And you started drinking about the 6th of December? A. No, about the 8th.

"Q. About the 8th of December. Now, what was your condition, or what did your condition become after you started drinking? A. Well, I started to go crazy all over again.

"Q. What do you mean by that? A. Wanting more whiskey all the time.

"Q. Did you become intoxicated or not? Were you drunk, or not? A. I was drunk.

"Q. Very much so, or slightly so? A. I was pretty drunk. .

"Q. Well, what did you do, Mr. Nelson? A. Well, on the night you are talking about that this accident happened now—

"Q. I am just asking you now when you began drinking this last time, just go ahead now and tell the jury exactly what happened. A. Well, there was a fellow out there that gave me two bottles of beer and I drank those. There was another fellow out there that gave me a part of a half pint of whiskey and I drank that. After I got that down I simply wanted some more, so I proceeded to go off myself and I either got a pint or two half pints, I don't know which, and carried it back to the hospital with me. When I got back to the hospital I went in my room and sat there and took two or three drinks. As I recall now, Friday, December 10th, was pretty cold and I would take a drink and go out in the air and stir around a little—

"Q. Speak a little louder. A. My teeth make it so I can't speak plain. I would take a drink and go out in the air and come back and take another drink. So finally, getting late in the evening, I went in the room and it was warm in there and I took a great big drink and I went out in the air again and then I went up to what is known as the lady nurses' office, and I walked in there and sat down, and while I was in there, why, this drink started to knocking me over, and I started to singing, and I don't know what I started doing, but I probably started doing something, because they wanted to get me out of there and did get me out.

"Q. You say you began singing? A. Yes, I think I did. I had forgotten where I was.

"Q. And where were you, Mr. Nelson? A. I was in the lady nurses' office.

"Q. How far is that office from the room that you had been occupying, approximately? A. Oh, probably a hundred and fifty feet.

"Q. After you began singing, or whatever you were doing there, what next happened to you, Mr. Nelson? A. Well, Mrs. Hewitt, the night supervisor, told me that I had to get out of there and she called the night boy nurse, Huff, who had charge of the men, Mr. Huff, and he, in turn, called Mr. Levision.

"Q. Levison was another attendant out there? A. That is right.

"Q. A male attendant, wasn't he? A. That is right.

"Q. Now then, what did Mr. Huff and Mr. Levison or anybody else, if there was any one else, do? A. Well, as I recall, when they got me out in the air I was pretty drunk and they assisted me to my room, and I probably staggered along down there.

"Q. Now, after you were taken to your room do you recall whether or not, with clearness, just what happened, or transpired? A. I don't recall it all because I was too drunk. I had forgotten where I was—

"Q. All right then—

"Mr. Sims: He didn't finish. He said he had forgotten where he was.

"A. That is right, I didn't know where I was, and as I recall now, I started to singing and hollering.

"By Mr. Watkins:

"Q. Did the night nurse, Mrs. Hewitt, remain there or not, or do you recall? A. No, she just went to the room with me, as I recall, she and Huff and maybe this Levison. I don't know when he came in.

\* \* \* \* \* \*

"Q. Well, just go ahead and detail to the jury what else took place, as you remember it? A. The next and only thing I remember was, I walked to the clothes closet and pulled off my coat and hung it up and I turned around and walked to the door and Mr. Levison was standing at the door, and as I recall, I had my hands in my pocket and I said, 'What are you looking so mad about?'' The next thing I knew I found myself on the floor. How long I had been out I don't know, but I remember picking myself up off the floor and walking to the mirror and trying to get my tie off, and wanted to get a Doctor.

"Q. When you got up from the floor what did you find had happened? A. Well, I thought only a tooth had been knocked loose here and what I wanted was a dentist or somebody to pull it out, but I could not shut my mouth very much down there, and it just hung open, and I thought it was on account of this tooth.

"Q. What did you do then? A. I started hollering for a Doctor and Mrs. Hewitt came down there and she told me to stay in the room and she would get a Doctor. So I remained in the room and Dr.

Manasco came down. He was an interne out there, and he looked at my face and looked at my mouth and I asked him for a dentist and he said there was not any there then, so he ordered a hypodermic, which was given me by Mrs. Hewitt, and put me to sleep and I stayed asleep all night.

"Q. Now, I will ask you right there, who is Dr. Manasco? A. He was an interne out there. I don't know whether he is still there or not.

"Q. An interne at the Madison Sanitarium and Hospital? A. That is right.

"Q. Now, when you woke up the next morning what next occurred? Just tell the jury in your own way. A. I was pretty sober then and nervous and in bad shape and Mr. Levison came over and shook hands with me and said he was sorry. I laughed at him, and I thought it was all a joke. I didn't know there was anything except a tooth had been knocked loose and I was going to forget it. The fact of it is, I didn't want anybody to know about it.

"Q. Why? A. I was just ashamed of it.

"Q. Go ahead. A. And he said that he was sorry and I told him, 'That is all right.' so I managed to shave with my mouth open. I couldn't shut it. It was hanging down but somehow I managed to shave up and in the morning sometime Dr. Lew Wallace came in there and run his hand around over my face and looked at my mouth, and I asked him for a dentist and he said there wasn't any there. The dentist was not there except once a week, and I said, 'I will have to have somebody to pull this tooth.' I didn't know I had a broken jaw. And he says, 'Yes, you need a dentist. I can't tell much about it.' He said, 'It is all swollen up there,' and rubbed his hand around over my face. I said, 'I have got to go into Nashville then and see a dentist; I have got to have a dentist; I have got to do something about this mouth; it is causing me too much trouble; I can't even shut my mouth.'

"Q. When Dr. Wallace came in what, if anything, did you say to him, and what did he say to you with reference to the condition that you were then in, Mr. Nelson? A. Well, when he came in he asked me what in the world had happened and I was kidding and joking with him and told him I stumbled over a rug and fell into the door. Of course, he laughed at me, and he knew better than that, but I still just thought I had a tooth that had to come out.

\* \* \* \* \* \*

"Q. Now, Mr. Nelson, you said, I believe, that Mr. Levison spoke to you the next morning. Did I understand you to say that he apologized? A. He came over to the bed and shook hands with me, and said, 'I am sorry,' and I laughed at him, and said, 'That is O. K.'

"Q. What did he say he was sorry for? A. For hitting me."

\* \* \* \* \* \*

Excerpts from the plaintiff's cross-examination are as follows:

"Q. You have a pretty good memory? A. Fairly good.

"Q. You can go back and remember and tell the jury about all the drunks you have been on for the last ten or twelve years and remember everything except when you tried to beat up this little twenty-two year old boy out there? A. I don't know whether I can give any detail about all of them but I can tell about some of them.

"Q. That is the only thing that happened on this night that you don't remember, when you jumped on this twenty-two year old boy, Lloyd Levison? A. Well, I am not saying.

"Q. You remember everything else perfectly? A. All right, I can't remember that then.

"Q. Why don't you remember it? A. I guess I was too drunk to remember all that went on.

\* \* \* \* \* \*

"Q. And what was some of the things you did up there, to some of those lady nurses? Do you remember any of those? A. Well, I went to hollering for one thing, I suppose.

"Q. What kind of singing were you doing? A. I don't know.

"Q. What kind of jokes were you telling? A. Who said I told any jokes?

"Q. I am asking you. A. I don't know.

"Q. How were you acting toward the women? A. I treated them every one courteously.

\* \* \* \* \* \*

"Q. How many times were you out there? Did this little Levision boy wait on you or take care of you? A. I don't remember. He had been with me before though.

"Q. A nice little boy, wasn't he? A. As far as I know.

"Q. He has always treated you nicely and courteously, hadn't he? Isn't that right? A. Up until the last time.

"Q. That is the only time you don't remember what you did to him, on that night, isn't it? A. No sir.

"Q. Well, you do remember that after you left the nurses up there, when they got you away from there, you said you walked down to your room? A. That is right.

"Q. I will ask you if Levision didn't hold your hand, or hold your arm, and walk you down to your room? A. Well, he might have.

"Q. The fact of the business is, you know he did, don't you? A. I don't know.

"Q. You remember when you got in the room there you decided you were going to leave, don't you? A. I don't remember anything about that part.

"Q. Didn't you say you were going to leave and go and get some more whiskey? A. I might have said that. I don't know.

"Q. Well, do you remember this, that you took off your coat and

said, 'Now, we are going to have a sure enough fight if you don't let me out of this door'? A. I don't remember that either.

"Q. The only thing you know is that you were just as nice and quiet as you could be although drunk? A. I remember starting in the hall, when I got in my room. I do remember that but I don't remember anything else.

"Q. Would you know Levison if you saw him? A. Certainly.

"Q. Had you ever had any trouble with him? A. No sir."

\* \* \* \* \* \*

"Q. Madison is not a jail, or anything like that? A. No, sir.

"Q. You went out there every time you went voluntarily? A. That is right.

"Q. And they always treated you nice and tried to help you? A. That is right.

"Q. And when you went out there on November 28th, 1937, you were sober? A. That is exactly right.

\* \* \* \* \* \*

"Q. How long had you been in that condition just before you went out, just about a day or so before this criminal case was coming up? A. I had been sober about two weeks. I went out there to stay about two weeks or three weeks to get built up for an operation.

\* \* \* \* \* \*

"Q. I am talking about on this night when you got hurt. What time did you come into town and get your liquor? A. Sometime in the afternoon. I don't know what time it was.

"Q. What time did you get back out to Madison? A. Oh, sometime around supper time, I couldn't tell you exactly.

"Q. About mid-night, wasn't it? A. No, it was mid-night when I got so drunk.

"Q. What did you do then—just go back to your room and continue drinking this two pints of whiskey ? A. Just kept pouring it in.

"Q. But it never did make you drunk or get you to the point where you could not remember until you put your hands in your pocket and started towards the door, and then this young boy was there— that is the last thing you remember? A. I beg your pardon there. I took a big drink and went up to the lady nurses' office and walked in there and sat down and that is when it started hitting me.

"Q. And you remember you were singing and carrying on up there? A. I do. That is when they hustled me out.

"Q. When they hustled you out you remember going back to your room? A. I remember going to the room.

"Q. And then when you got back down to the room you remember going into the room? A. That is exactly right.

"Q. Then you remember taking off your coat? A. That is right.

"Q. And then you remember putting your hand in your pocket? A. That is all that I remember.

"Q. Don't you remember Levison standing in the door and looking mad at you? A. Yes sir.

"Q. And you asked him what he was doing looking so mad? A. Yes, sir.

"Q. What did he say to you? A. I don't think he said anything. He answered that with a strike on the jaw.

"Q. You remember that? A. No, I don't remember that. The only thing I remember is picking myself up off the floor. I don't remember the lick at all.

"Q. Do you know whether he hit you or not? A. I know somebody hit me.

"Q. Do you know who else was in the room? A. Not anyone.

. . . . . .

"Q. You knew that you had done wrong? A. I knew that I had been drunk, yes sir.

"Q. And tried to beat up that little boy too, didn't you, isn't that right? A. I didn't try that.

"Q. You know you had done wrong. You didn't do what? A. I didn't try that, in the first place.

"Q. You didn't try what? A. Beat up that little boy, as you call it.

"Q. How do you know you didn't? A. I know I didn't.

"Q. I thought you said the last thing you remembered was him standing in the door? A. That is the last thing I remember. I didn't try to beat up anyone.

"Q. Do you reckon you passed out? A. I imagine I did.

"Q. You don't know whether you passed out or fell on the floor? A. If I passed out why did he hit me on the jaw?

"Q. You might have fallen on the floor and broke you jaw? A. Yes, sir.

"Q. You don't know what happened? A. That is exactly right. I don't remember what happened after he hit me.

"Q. How do you know he hit you? A. Well, By God, something hit me.

"Q. What was that you said? A. I said, I beg your pardon.

"Q. You said what? A. I said something hit me. I don't know what it was."

Plaintiff introduced, as exhibits to the testimony of his witness Miss Lela Rice, two letters written and mailed to the witness by Walter H. Hilgers, Business Manager of the Sanitarium, and a written statement signed by Lloyd Levison which Mr. Hilgers had enclosed in the last of his two letters to the witness. These documents were introduced by plaintiff as admissions by defendant. The first of the two letters was written prior to plaintiff's injuries, and the other subsequent thereto. The first of the two letters reads as follows:

"Madison College, Tennessee, December 6th, 1937.

"Miss Lela Wade Rice, Alabama College, Montevallo, Ala.

"Dear Miss Rice: I received your kind letter of December 2nd, and am glad to report that your nephew is giving more cooperation at this time than he has at any time in the past. He seems to be getting on his feet very rapidly.

"With kindest regards, I am

"Yours very sincerely,

"[Signed] Walter H. Hilgers."

The second of the two letters is as follows:

"Madison College, Tenn.,

"December 14th, 1937.

"Miss Lela Wade Rice, Box 33, Alabama College, Montevallo, Ala.

Dear Miss Rice: I am in receipt of your letter of December 11th. and we had intended writing you this morning concerning the entire affair about which you wrote. I think it is best that I mail you a copy of the statement made by the nurse in regard to your nephew.

"Mr. Nelson went out and became intoxicated and returned to the hospital. It seems that he threatened several of the nurses and became very angry. In fact, he twisted the arm of the head nurse, Mrs. Hewitt, very severely. There were two nurses with him in the room and when he made a pass at one of them the nurse hit him in self defense.

"It seems that every time he becomes more and more unreasonable and he is not the kind and gentle man we once knew him to be.

"We will let you know more definitely just how he is. I believe that Dr. Wallace will write to you.

"Yours very sincerely,

"[Signed] Walter H. Hilgers."

The written statement of Lloyd Levison, enclosed by Mr. Hilgers in his letter of December 14, 1937, to Miss Rice, reads as follows:

"On Thursday night, December 9th, and Friday morning, I was called on special duty by Clester Huff, who stated that George Nelson had come in drunk. He had been on duty but they could not take care of him, so he called me to the sanitarium.

'I came to the sanitarium about one o'clock and saw Mr. Nelson staggering to his room. I went into the room with Mr. Nelson. He began to scream, holler, sigh and carry on. Then Mrs. Lawrence Hewitt came to the door and stood outside. Mr. Nelson tried to throw me out of the room. I wrestled around with him for a couple of minutes and finally put him down on his back. Then I let him up. He was quiet for a while but started to move all the furniture to the back part of the room and said that we were going to have a lot of fun—we were going to fight. He started to scuffle around with me and I tapped him a little just once, which did not hurt him, but he stopped a while. All this time he was making passes at me and hit.

me in many places but not in the face. I tried not to hit him but to guard myself.

"The Mr. Clester Huff came into the room. Then we forcibly gave him a hypodermic. He became very unruly and angry and started to fight again—said he was going home. We told him he could not go home in that shape. He wanted to know who would stop him. A twenty year old 'kid' could not stop him from going home. He started toward me. I backed away from him, telling him not to hit me, but he kept coming on with his fist held up, and when he got me back into the corner, he started to hit me. I hit him first before he had a chance to hit me.

"[Signed] Lloyd Levison,

"Chester R. Huff."

The testimony of plaintiff and Dr. H. V. Roy, a dentist, and Dr. Walter O. Faught, an oral surgeon, substantially supports the averments of plaintiff's declaration (hereinbefore quoted) with respect to the character and extent of plaintiff's injuries. For the purposes of the present appeal, a more extended statement on this latter point is unnecessary.

At this point, we will consider the probative effect of the letter written by defendant's Business Manager, Hilgers, to the witness, Miss Lela Rice, of date December 14, 1937, and the written statement of Lloyd Levison enclosed therewith, both of which were introduced in evidence on behalf of plaintiff on the theory that they constituted admissions by defendant against its interest. These writings were admitted without objection, and we see no ground upon which an objection to their admission in evidence could have been successfully interposed. But there is some difference in the views of the respective counsel for the parties with respect to the probative value of such parts of the statements in these writings as tend to exculpate the defendant.

"The admissions and confessions of parties are always evidence against them; and all they said at the same time is always evidence for them; but not what they said at any other time." History of a Lawsuit (4 Ed.), (Martin), page 279.

In this connection, plaintiff cites 22 C. J., pages 412, 413, section 495, where it is said: "The party offering a written admission is not bound by all the statements in the writing, but may take advantage of such as are in his favor and contradict the rest".

But the rule thus stated does not mean that such statements in a written admission as are favorable to the party against whom the admission is proved may be ignored. It is said in Jones on Evidence (2 Ed.), Vol. 3, page 1957, that "Every admission upon which a party relies is to be taken as an entirety of the fact which makes for his side, with the qualifications which limit, modify, or destroy its effect on the other side. This is now a settled principle which

has passed, by its universality, into a maxim of the law''; and in the same volume, at page 1962, it is said: ''A court or jury is not bound to give credit to all parts of a statement or admission; they may believe a part and disregard the rest. The rule only requires that what is in favor of the party making the admission should be fairly and liberally considered and weighed with the other evidence. Of course, the one offering admissions of this character is not bound by the statements which are favorable to the declarant. He may rebut such statements or show them to be erroneous; and it is for the court or jury to reject such portions of the statement, if any, as appear to be inconsistent, improbable or rebutted by other circumstances in evidence.''

The rules thus stated in Jones on Evidence were quoted and approved in the cases of West v. Southern Railway Company, 20 Tenn. App., 491, 496, 100 S. W. (2d), 1004,, and Nichols v. Smith, 21 Tenn. App., 478, 488, 111 S. W. (2d), 911.

In West v. Southern Railway Company, supra, wherein the plaintiff introduced certain declarations as evidence of admissions of the defendant against its interest, which declarations contained certain statements tending to exculpate the defendant, the appellate court held that the trial Judge had erred in directing a verdict for the defendant, but should have submitted the case to the jury, for the reason that there was evidence reasonably tending to contradict the aforesaid statements favorable to the defendant.

In Nichols v. Smith, supra, it was held that the parts of the statements of the declarant which were favorable to the defendants were not contradicted or discredited by other evidence, and were sufficient to destroy the prejudicial effect of the entire statement of the declarant as an admission against the interest of the defendants; and the action of the trial court in directing a verdict for the defendants was affirmed.

In determining whether there is any evidence to require the submission of a case to the jury, it should be remembered that the ''scintilla rule'' does not prevail in Tennessee. There must be some evidence of a material and substantial nature to support the plaintiff's case in order to take the case to the jury. Brenizer v. Nashville, C. & St. L. Railway, 156 Tenn., 479, 484, 3 S. W. (2d), 1053, 8 S. W. (2d), 1099; Coca-Cola Bottling Co. v. Rowland, 16 Tenn. App., 184, 191, 66 S. W. (2d), 272.

With respect to the theory that this is an action to recover damages for injuries to plaintiff resulting from a failure of defendant to give plaintiff such care and attention for his safety as the circumstances required (as distinguished from the action for assault and battery), there is not only an absence of specific averments in the declaration upon which such action could be predicated, but there is no material evidence to support such theory. Plaintiff had vol-

untarily entered the Hospital for the purpose of being "built up" for a surgical operation. He was entirely sober when he arrived at the Sanitarium, and had been sober for sometime prior thereto, and remained sober during the period of eleven or twelve days which intervened between his arrival and the evening of December 9th when he became intoxicated. He was under no restraint, and until the evening of December 9th nothing occurred which would reasonably suggest that he should be placed under any restraint. As soon as it was discovered that he was intoxicated, he was placed in the care of a male attendant who, so far as the record shows, was competent and qualified for that duty.

Considered as a Hospital conducted for private gain, defendant Sanitarium was not an insurer of the safety of its patients. "While all the authorities hold that a private hospital owes to its patients such reasonable care and attention for their safety as their known mental and physical condition reasonably requires, yet this is always limited by the unbending rule that no one is required to guard against or take measures to avert that which under the circumstances is not likely to happen, or, more accurately, which a reasonable person under the circumstances would not anticipate as likely to happen. The law only requires reasonable care—that care to avert dangers which a reasonable man would take under the circumstances as they exist—and no man does or is required to take measures to avert a danger which the circumstances as known to him do not suggest as reasonably likely to happen. These circumstances include the patient's mental condition and abberrations, and what he is likely to do by reason thereof, the degree of his mental and physical helplessness, and the dangers which his surroundings afford." Davis v. Springfield Hospital, 204 Mo. App., 626, 218 S. W., 696, 699.

Plaintiff Nelson had been a patient in defendant Sanitarium throughout ten or twelve different periods during the preceding two years, and he stated, in his testimony, that, on those occasions, or some of them, he had been seen by practically all of the defendant's officials and nurses in an intoxicated condition, but there is no indication in the record that he had on previous occasions been unruly, or had showed a disposition to "fight". Defendant Sanitarium was not bound to guard against or take measures to avert that which a reasonable person would not, under the circumstances, anticipate as likely to happen. Fetzer v. Aberdeen Clinic, 48 S. D., 308, 204 N. W., 364, 39 A. L. R., 1423; Torrey v. Riverside Sanitarium, 163 Wis. 71, 75, 157, N. W., 552.

In support of plaintiff's contention that defendant did not give plaintiff such reasonable care and attention for his safety as his condition required, his counsel cites the cases of Hogan v. Clarksburg Hospital Company, 63 W. Va., 84, 59 S. E., 943, 945; Tate

v. McCall Hospital, 57 Ga. App., 824, 196 S. E., 906; Sisters of the Sorrowful Mother v. Zeidler, 183 Okla., 454, 82 P. (2d), 996.

Each of the three cases thus cited for plaintiff was based on negligence of the hospital in leaving the patient unattended while in a delirious and irrational condition, and we do not regard them as applicable authorities in the instant case. They announce no general principles in conflict with those we have hereinbefore stated.

If we view this case as an action against the defendant for an assault and battery upon plaintiff by the defendant's servant; the defendant is, of course, not liable unless the servant was guilty of such an assault and battery in contemplation of law.

This is a corollary of the ruling in Loveman Co. v. Bayless, 128 Tenn., 307, 312, 313, 160 S. W., 841, Ann. Cas., 1915C, 187.

██ The plaintiff was voluntarily intoxicated and "his drunkenness doth not extenuate his act of offense, nor turn to his avail." Atkins v. State, 119 Tenn., 458, 486, 487, 105 S. W., 353, 360, 13 L. R. A., N. S., 1031.

It is obvious that, in striking plaintiff, Levison was not actuated by malice or ill-will, or a desire to injure plaintiff; and the circumstances disclosed by his statement in evidence were reasonably calculated to create apprehension in his mind that he was in danger of great bodily harm at the hands of plaintiff. He struck plaintiff solely to repel a threatened attack by plaintiff, and it is obvious that the serious injuries to plaintiff's jaw that resulted from the blow were wholly unintended and unexpected.

██ It is argued for plaintiff, in substance, that the testimony of plaintiff contradicted Levison's statements to the effect that plaintiff was threatening and attempting to strike him (Levison) at the time Levison struck plaintiff, and that a material issue of fact was thereby presented for the jury to decide. We do not think so. While plaintiff was entitled, on motion for peremptory instructions, to the most favorable view that could reasonably be taken of his testimony, this rule has reference to the whole of his testimony, and not to isolated statements therein which were inconsisent with other parts of his testimony. Johnston v. Railway Co., 146 Tenn., 135, 157, 240 S. W., 429. The mere "dogmatic assertion" of plaintiff that he did not try to "beat up" Levison, did not interfere with the duty of the Court to direct a verdict for defendant, when plaintiff stated elsewhere in his testimony that he did not remember what occurred at the very time when (according to Levison's statement) plaintiff was attempting to strike Levison. Fitch v. American Trust Co., 4 Tenn. App., 87, 94.

We are of the opinion that the trial Judge did not err in directing a verdict for the defendant, and the plaintiff's first eight assignments of error are overruled.

Through his remaining assignment of error (the ninth) plaintiff complains of the action of the trial court in sustaining defendant's objection to certain testimony of the plaintiff's witness, Miss Lela Rice, in response to a question of plaintiff's counsel, which question and answer are as follows:

"Q. Now, about the matters stated there in the statement, did you make any investigation as to that, and if so, what was the nature of the investigation and where? A. I made an investigation. It was in his room, Mr. Nelson's room. I sent for Mrs. Hewitt and she came in and I asked her about Mr. Nelson's wrenching her arm and how badly it was, and so forth, and she said he didn't do it."

The witness, Miss Rice, was at the Sanitarium investigating the circumstances attending the injury of the plaintiff, her nephew. Mrs. Hewitt was employed by defendant as night supervisor of nurses. She was not a witness at the trial. The purpose of the excluded testimony was to prove the statement of Mrs. Hewitt as an admission by defendant. It does not appear that she was a general agent of defendant, or had authority to bind defendant by such admissions, and the excluded evidence was "hearsay" and was properly excluded. Tenn. Cent. Railway Co., v. Gleaves, 2 Tenn. App., 549; Smith v. Fisher, 11 Tenn. App., 273, 284; Travis v. Railroad Co., 9 Lea, 231, 233.

It may be well to say, in this connection, that the statement of Levison was admissible (although he was merely an employee of defendant) for the reason that it was furnished to Miss Rice by the Business Manager of the defendant, and Levison was thereby made the "accredited agent" of the defendant, for the purpose of making the statement. Jones on Evidence, (2 Ed.), pages 1784-1786, secs. 971, 972. There is nothing in the record from which it could be inferred that Mrs. Hewitt was an "accredited agent" of the defendant for the purpose of making admissions against its interest. Plaintiff's ninth assignment of error is overruled. It results that the judgment of the Circuit Court dismissing plaintiff's suit at his cost is affirmed, and judgment will be entered accordingly. The costs of the cause, including the costs of the appeal, will be adjudged against the plaintiff George L. Nelson.

Crownover and Felts, JJ., concur.