PAULA REEVES NICHOLAS, Plaintiff-Appellant, v.
PROVIDENT LIFE & ACCIDENT INSURANCE
COMPANY, Defendant-Appellee.—457 S.W.2d 536.

Western Section. April 27, 1970.

Certiorari Denied by Supreme Court August 17, 1970.

Jesse E. Johnson, Jr., and C. Thomas Cates of Burch, Porter & Johnson, Memphis, for plaintiff-appellant.

Elmore Holmes, III, of Armstrong, Allen, Braden, Goodman, McBride & Prewitt, Memphis, for defendant-appellee.

PURYEAR, J. This appeal involves a case in which the beneficiary in an accident policy sued to recover the accidental death benefit.

The plaintiff-appellant, to whom we will hereinafter refer as plaintiff, sued the defendant-appellee, to which we will hereinafter refer as the defendant, and alleged in her declaration that she is the widow of Jerry Thomas Nicholas, who died on or about June 17, 1968; that at the time of his death there was in full force and effect a policy of insurance issued by defendant contracting to

pay $12,000.00 to plaintiff in the event of accidental death of her said husband.

In said suit, plaintiff seeks to recover the accidental death benefits of $12,000.00 plus a statutory penalty of $4,000.00.

To said declaration, the defendant first filed a plea in which it averred that it is not indebted to plaintiff in the manner, form and amount alleged in the declaration, or in any other manner, form or amount; that the defendant did not undertake or agree as alleged in the declaration; and that Jerry Thomas Nicholas did not lose his life by ''accidental means'' within the coverage of the insurance policy sued upon.

Thereafter, in response to a motion filed by plaintiff, defendant filed a special plea admitting that the policy mentioned in the declaration was in full force and effect at the time said Jerry Thomas Nicholas died, and averring that his death was caused by said decedent voluntarily and deliberately pointing a pistol at his own head and further averring that decedent, as a reasonable man, either foresaw, or should have foreseen, that death or injury to himself might result and therefore, his death was not accidental within the meaning of the policy.

The case was tried on the 4th day of June, 1969, before the Circuit Judge and a jury and the only evidence introduced in the case was that offered and introduced by plaintiff.

At the conclusion of all of the evidence, the defendant moved for a directed verdict in its favor, which motion was sustained and the suit dismissed.

Plaintiff filed a motion for new trial, which was over-ruled, and this appeal in error resulted.

One assignment of error has been filed, to-wit: "The Judge erred in granting the defendant's motion for a directed verdict at the close of all the evidence and rendering judgment for the defendant."

As has been held in numerous cases in this State, the rule for determining a motion for a directed verdict requires the trial Judge and the reviewing Court on appeal to look to all of the evidence to take the strongest legitimate view of it in favor of the opponent of the motion, and to allow all reasonable inferences from it in his favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied. General Motors Corp. v. Dodson (1960), 47 Tenn.App. 438, 338 S.W.2d 655; Poole v. Bank (1946), 29 Tenn.App. 327, 196 S.W.2d 563; Phillips v. Newport (1945), 28 Tenn.App. 187, 187, S.W.2d 965 and many other cases.

Likewise, and in reverse order, it is true that where there is no material and determinative evidence to support a verdict for the opponent of the motion, it must be sustained. Cude v. Culberson (1947), 30 Tenn. App. 628, 209 S.W.2d 506; Camurati v. Sutton (1960), 48 Tenn.App. 54, 342 S.W.2d 732.

Although the record does not reveal the age of decedent at the time of his death, he was an adult and had previously served for about two years in the United States Marine Corps. At the time of his death, he was employed as a salesman and photographer and one of his business

associates was another young man by the name of Ronald Lee Chambers.

On the day the tragedy occurred, decedent and Chambers had been together on a business trip and when they returned they went to decendent's home, where Mrs. Chambers, wife of said Ronald Lee Chambers, was taking care of the infant child of decedent while his wife, the plaintiff in this suit, was at work.

The only two eye-witnesses to the tragedy were Mr. and Mrs. Chambers and the way and manner in which it occurred was described in Mr. Chambers' testimony, as follows:

"A. Well, we were just sitting in the living room having a conversation, and the subject come up about guns somehow. I don't remember what brought the subject up, and Mr. Nicholas went in the bedroom and brought out his revolver.

Q. Do you know what kind of revolver it was?

A. It was a .38.

Q. All right, and a revolver type that had one of these spinning chambers, is that correct?

A. Yes, sir.

Q. Then what happened?

A. Nick was looking at the gun, and he unloaded it and handed it to me, and I looked at the gun, and I gave it back to Nick, and he put a bullet in one of the chambers and spun the chamber and was looking down at the gun, and he said * * * He was looking at the gun, and he said, 'If I had pulled the trigger, it would have

killed me', and the conversation kept going, and he had spun the chambers again and was looking in the gun, and it fired.

Q. Did he look in the chamber the same way he had the first time?

A. Yes, sir, sure did.

Q. Do you know whether the gun * * First, let me ask you were you looking right at him when this occurred, when the gun fired, or do you remember?

A. I think I was looking right at him.

Q. Do you know whether or not the hammer on the revolver was cocked? Did you ever see that cocked or not?

A. I don't know, sir.

Q. You don't know whether it was?

A. No, sir, I couldn't say about that for sure, but I don't think it was cocked.''

(B. of E. pp. 49-50)

Mrs. Chambers testified to the details of the tragedy as follows:

''A. Well, Nick and Ronnie came in, and I believe I was feeding the baby. No, I just put the baby to bed; he already had his lunch, and Ronnie was on the couch and Nick went back to the bedroom to change clothes, and he came back in and he had a gun in the holster, and he was showing it to Ronnie and talking about how it operated, and he walked over to the chair, then he handed Ronnie the gun to look at. He had took a bullet out, and Ronnie looked at it and handed the gun back

to him, and he was sitting in the chair with it, and I turned around to talk to Ronnie, and about that time the gun went off, and I looked back just in time to see him stiffen in the chair and * * * (Interrupted)

Q. Do you know whether or not he had spun the cylinder part of the gun and looked at it a time or two, or do you know?

A. I can't say for sure that I saw that, no, sir."

(B. of E. pp. 62, 63)

Since plaintiff was not at home at the time, she knew nothing about the manner in which the tragedy occurrred.

Plaintiff testified that the pistol which inflicted the fatal wound was one which the decedent had borrowed from a friend of his in Oklahoma City, and that she returned it to the owner after the tragedy occurred therefore, it was not available as evidence upon trial of the case.

The only other evidence in the case was the testimony of one Robert C. Sheffield, a firearms expert, and the pertinent portion of his testimony is as follows:

"Q. Now, Mr. Sheffield, if I would come out to your place there at the Gun Club with a Smith & Wesson revolver and one bullet and give that to you and ask you to put it in whatever chamber you selected, and then let you make the selection each time, how many times could you fire that revolver on your pistol range, pull the trigger without it firing the bullet?

A. If you let me select the chamber that I am going to put the cartridge in, I can snap it all day long without it going off, if I change each time.

Q. Now I want to ask you this. If you have a Smith & Wesson that has, let us say, five chambers, are you saying that you could put the bullet in any one of the four chambers and change it each time?

A. Right.

Q. Now how does the Smith & Wesson that spins from the side, where must the bullet be in the cylinder or in the chamber barrel or whatever is the proper positioning so that it will fire the first time it is cocked?

A. It would have to be in the chamber immediately to the right of the barrel so that when the hammer was drawn back to return to the left to fire.

Q. Now that would be when you were on your firing range with the pistol facing away from you, is that correct?

A. That is correct.

Q. Now if you turned the pistol toward you, where would then your bullet have to be?

A. Well, this would reverse the situation. As you looked at it from the front, the cylinder would be turning to the right.

Q. Now did you ever take a pistol and point it toward Robert C. Sheffield?

A. No, I never do.

Q. Why would you not do that?

A. Well, from the long years of experience, I would be afraid to do it because I might make a mistake.''

(B. of E. pp. 68, 69)

\*  \*  \*  \*  \*  \*

"A JUROR: If a shell coming up to the barrel, which would be on the lefthand side, if you were looking down in the barrel, could you see that bullet, or would it be blocked by the frame of the gun on that particular side on a Smith & Wesson?

THE COURT: That is a proper question. I will let him answer it.

THE WITNESS: Well, there is a shield on the back of most revolvers, but generally you can see the rim of the cartridge barely visible around that shield in the case of a .38."

(B. of E. p. 70)

The insuring clause in the policy upon which this suit is brought is as follows:

"Upon receipt of due proof by the Insurance Company that a dependent of any Employee has sustained any of the losses named in the Table of Losses below, as the result of bodily injuries due to external, violent and accidental means sustained while the Employee is insured under this policy with respect to such dependent, and that loss has occurred within ninety days after the date of the accident, the Insurance Company will pay to the Beneficiary the benefit provided in the Table of Losses and Schedule of Insurance for the loss, but not more than one of the amounts shown below, the greater, shall be payable for all losses resulting from all injuries sustained by the Employee's dependent in any one accident."

(Tech. Rec. p. 17)

The determinative question which confronts us here is whether or not there is any material evidence in the case

from which reasonable persons could conclude that the decedent's death resulted from "accidental means" as used in the insuring clause of the policy in question.

Two of the cases upon which plaintiff relies are Aetna Life Ins. Co. v. Kent (1934), 73 F.2d 685, decided by the Sixth Circuit Court of Appeals, and the unreported opinion in Holmes v. Interstate Life and Accident Ins. Co., filed by this Court at Nashville on December 5, 1969.

Plaintiff concedes existence of the rule laid down in Stone v. Fidelity Cas. Co., 133 Tenn. 672, 182 S.W. 252 (1915), which was restated by this Court in Holmes v. Interstate Life and Accident Ins. Co., supra, as follows:

"Injury is not produced by accidental means, within the meaning of an accident policy, where such injury is the natural result of an act or acts in which the insured intentionally engages. A person may do certain acts the result of which produces unforeseen consequences resulting in what is termed an accident; yet it does not come within the terms of the contract. The policy does not insure against an injury that may be caused by a voluntary, natural, ordinary movement, executed exactly as was intended.

Therefore, to determine the matter, we look, not to the result merely, but to the means producing the result. It is not sufficient that the injury be unusual and unexpected, but the cause itself must have been unexpected and accidental."

However, plaintiff insists that, as we held in the Holmes case, the instant case falls within the exception to the rule stated in Smith v. Aetna Life Ins. Co. (1940), 24 Tenn.App. 570, 147 S.W.2d 1058, as follows:

"The courts generally hold that death or injury does not result from accident or accidental means within the terms of an accident policy where it is the natural result of the insured's voluntary act, unaccompanied by anything unforeseen, except the death or injury. There are some courts, however, which hold that the death or injury is by accidental means and that recovery may be had, where something unforeseen or unexpected occurs which produces the death or injury, although the act preceding it is the intentional act of the insured. The majority of the courts, however, including those of this state, hold that the means are not accidental, and that there can be no recovery, where the death or injury is the result of the voluntary or intentional act of the insured, even where the result is unforeseen or unexpected, *in the absence of some mishap or mischance or slip in the doing of the act itself.*" (emphasis supplied) Supra, p. 573, 147 S.W.2d at p. 1060.

The language which we have italicized in the foregoing quotation is emphasized for the purpose of showing the exception to the rule, which exception was applied in the Holmes case.

Plaintiff's theory in the instant case is stated in the brief as follows:

"It is submitted that the jury could find from the evidence that immediately preceding the insured's death, he was looking at the chamber and barrel of the pistol and that he miscalculated as to where the one bullet in the pistol would have to be before the trigger was pulled in order for the bullet to be fired. The deceased may have thought the bullet would fire if it were located in any of three places, i. e., the barrel, the chamber immediately to the left of the barrel, or the chamber

immediately to the right of the barrel. Since it is conceded that the death was not caused by suicide, it appears obvious that the deceased simply made a mistake in his calculations regarding the workings of his pistol and that mistake was the means of his death.''

To bolster this theory, plaintiff's counsel refer to the testimony of Mr. Sheffield, but this witness was not asked what would be likely to occur if the revolving cylinder should be spun before pointing the pistol and pulling the trigger as the deceased apparently did.

Certainly, an expert who is thoroughly familiar with a certain pistol and its operation can place one cartridge in a chosen position in the cylinder and then anticipate the result of pulling of the trigger, (although Mr. Sheffield said he wouldn't be willing to risk it upon himself), but the spinning of the cylinder between loading one chamber and pulling the trigger might very well change the anticipated result.

So, the evidence in this case leaves us with an unanswered question and we are urged to allow the jury to speculate as to what the answer to this question might be.

It has been held in numerous cases that a verdict may not be based upon mere conjecture or speculation. See cases cited in Volume 9, West's Tennessee Digest, Evidence, Section 597.

Furthermore, the pistol was not made available as evidence and there is nothing in the record from which the jury could conclude that the decedent was familiar with the pistol or that he knew anything about the matters concerning which Mr. Sheffield testified.

The only spark of evidence which can be cited in support of plaintiff's theory is the fact that the first time decedent pointed the pistol toward his head, he said that if he had then pulled the trigger it would have killed him.

This, according to plaintiff's insistence, is evidence that the decedent could look into the barrel or cylinder of the pistol and ascertain that the one cartridge in the cylinder was then in a position where it would have fired if he had pulled the trigger at that time.

But this mere spark of evidence is completely nullified and cancelled by the tragic fact that, when he did actually pull the trigger, this one cartridge was in a position where it would and did fire, thus causing his death.

When this evidence is considered in the light most favorable to plaintiff, it is nothing more than a "scintilla." Under the rule which prevails in Tennessee, this is not sufficient to justify submission of a case to the jury and it has been held there must be some evidence of a material and substantial nature in the plaintiff's case to take it to the jury. Nelson v. Rural Educational Ass'n. (1939), 23 Tenn.App. 409, 134 S.W.2d 181; Cude v. Culberson, *supra;* Moon v. Johnston (1959), 47 Tenn.App. 208, 337 S.W.2d 464.

■ "Substantial" evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Cude v. Culberson, supra, 30 Tenn.App. at page 639, 209 S.W.2d 506, and cases cited therein.

Although, there is no direct evidence to the effect that the decedent actually pulled the trigger, the only logical conclusion which could be reached from the evidence in the record is that he did pull it.

In fact, plaintiff does not even insist that the decedent didn't pull the trigger or that the hammer of the pistol was accidentally released.

Plaintiff's own witness, Mr. Sheffield, testified as follows:

"Q. Now before I forget this question, I want to ask you, in the case of a Smith & Wesson revolver, either a modern type or an older type, whichever it may be, do you know of any way that the pistol could fire without pulling the trigger?

A. It would have to have a blow on the cartridge itself. In other words, just holding it, I know of no way it could go off."

(B. of E. pp. 67, 68)

The decedent knew there was one live cartridge in the cylinder and this is what distinguishes the case from Aetna v. Kent, supra, and Holmes v. Interstate Life and Accident Ins. Co., supra.

In both of the foregoing cases, there was evidence from which the jury could logically conclude that the decedent believed the pistol to be unloaded.

So, this case presents undisputed and uncontroverted facts which bring it squarely within the rule laid down in Stone v. Fidelity, supra, later reaffirmed in several cases, including Baker v. National Life & Accident Ins. Co. (1956), 201 Tenn. 247, 298 S.W.2d 715.

In the Baker case, the decedent, Raymond V. Baker, voluntarily placed a pepper can, which was five inches high and two inches wide, upon his head and invited a man by the name of Bowerman to fire at it. Bowerman

agreed and told Baker to keep still. Baker said, 'don't miss the can.' Bowerman at that time was standing eight to ten feet from Baker, took careful aim and started squeezing the trigger on his revolver. Just then Baker moved his head slightly forward, thus causing the pepper can to tilt and start falling forward. Baker suddenly jerked his head up, but Bowerman's reflexes did not act fast enough for him to release his grip on the trigger, and instead of hitting the can the bullet entered Baker's head causing death instantly.

In holding that Baker's death was not caused by accidental means, the Supreme Court said:

"One who volunteers his head for such an experience must anticipate injury, if he is a normal person." Baker v. Nat. Life & Acc. Ins. Co., supra, 201 Tenn. at page 252, 298 S.W.2d at page 717.

Moreover, there is no evidence in the record which could bring the case within the exception stated in Smith v. Aetna, supra.

Also, the reasoning of the Supreme Court in Mutual Life Ins. Co. of New York v. Distretti (1929), 159 Tenn. 138, 17 S.W.2d 11, and Falster v. Travelers Ins. Co. (1964), 216 Tenn. 137, 390 S.W.2d 673, is applicable.

Such reasoning was expressed and applied in the two last mentioned cases as follows:

"The test of whether or not the injury or death in such a situation is accidental within the meaning of an accident policy is stated in Mutual Life Insurance Company of New York v. Distretti, 159 Tenn. 138, 17 S.W.2d 11, as follows:

'If, however, he voluntarily and intentionally did a thing from which, as a reasonable man, he foresaw or should have foreseen that death or injury might result, such death or injury was not an accident. Unless reasonable men could reach different conclusions as to the probable result of Distretti's conduct on this occasion, there was no question for the jury.' 159 Tenn. at 144, 17 S.W.2d at 12." Supra, pp. 146, 147, 390 S.W.2d at 677.

The Georgia case of Thompson v. Prudential Ins. Co. of America (1951), 84 Ga. App. 214, 66 S.E.2d 119, comes nearer to being factually parallel to the instant case than any which has been cited or which we have been able to find by independent research.

In the Thompson case, the decedent, one Robert L. Thompson, was insured under a policy of life insurance containing a double indemnity clause providing for such double idemnity in the event the insured "should come to his death as the result, directly and independently of all other causes, of bodily injury as result of violent and accidental means."

The decedent met his death as the result of playing the game of "Russian Roulette" and the facts are summarized by the Court of Appeals of Georgia in an opinion written by Presiding Judge MacIntyre, as follows:

"The testimony of the persons present at the time of the insured's death was for all practical purposes essentially the same on the question of how the insured met his death. Jerry Lee Bishop testified in part: 'The night before his death Robert took a gun out and he was showing us how he could put one bullet in it and spin the cylinder around and make it hit on the bottom. He did that five or six times that night and the bullet

always landed in the bottom. He pulled the trigger, but the bullet didn't fire. I did not pull the trigger that night. He just showed it to me after he had twisted it. I saw the bullet in the cylinder and it was on the very bottom. That was the night before his death * * *[The night of his death] Robert got the gun out and asked me if I wanted to play ''Russian Roulette'' and I said I did. He got the gun and took all the bullets out except one and twisted the cylinder around and handed the gun to me. I looked at it and said, Let's put it up. Don't play with it.' Robert said, 'All right, I will do it first.' He took the gun and put it to his head and fired it. He * * * [had taken] the cartridges out and put them on the counter there. There was just one left in the cylinder. He spun the cylinder and handed the gun to me and I took it in my hand and looked at it. When I looked at it the bullet was next to the top. I didn't tell Robert that it was next to the top. I didn't think anything would happen. I didn't think the gun would fire; [I thought] that the bullet would have to be on top [to fire]. When I saw the bullet it lacked one space of being even with the barrel, but Robert Thompson never saw that. He took the pistol and pointed it at his head and pulled the trigger. When Robert took the bullets out of the pistol that night and spun it, that was the same thing he did the night before. He didn't do it but one time the night of his death. The night before he did it five or six times. The gun did not fire the night before * * * As I testified on direct examination, Robert didn't see the bullet. I know he didn't see it because he didn't look at it. He just took the pistol out of my hand and put it to his head. He was looking at me when he took the gun out of my hand and said that he would do it first. He put the pistol to his own head and pulled the

trigger. That was the shot that killed him. That was the way he got killed. That is the way you play ''Russian Roulette'' according to the rules of the game and according to my understanding of the way you play it.' As we have said the testimony of the other witnesses present at the time of the death of the insured was to similar effect.'' Supra, 66 S.E.2d pp. 122, 123

In a well reasoned opinion in that case, the Georgia Court said:

''In Aetna Life Insurance Co. v. Kent, 6 Cir., 73 F.2d 685, 686, Judge Moorman, in an effort, evidently, to bring some order out of chaos, has this to say: 'There can be no doubt that there is much confusion in these decisions. Analyses can be of no assistance in harmonizing them or formulating a body of criteria by which all of them can be justified. Most of them rely upon United States Mutual Accident Ass'n v. Barry, 131 U.S. 100, 9 S.Ct. 755, 33 L.Ed. 60. Some of the courts relying upon this case seem to have construed ''accidental means'' as including an intentional act effecting an unusual or unexpected consequence or result. Among the earliest of these decisions, often cited, is Western Commercial Traveler's Ass'n v. Smith, 8 Cir., 85 F. 401, 40 L.R.A. 653. Other courts have drawn a distinction between accidental injury or death, and injury or death resulting from accidental means, by looking in the former case to the result, and in the latter to the means. Landress v. Phoenix [Mut. Life] Ins. Co., 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934, 90 A.L.R. 1382, affirming the decision of this court, [6 Cir.] 65 F.2d 232, is an authoritative and conclusive approval of this distinction. The courts accepting it have generally held that where an injury is the result of a voluntary act,

in the performance of which there was a "slip or mishap", it is to be regarded as having been caused by accidental means. Cf. Maryland Casualty Co. v. Massey, 6 Cir., 38 F.2d 724 [71 A.L.R. 1428]. Many courts have held, too, that the means are accidental if the doer of the voluntary act was ignorant of a material fact or circumstance which would have caused him, had he known it, to do the act differently or not do it at all. Cf. Pope v. Prudential Ins. Co., 6 Cir., 29 F.2d 185. It has been said, though, that the doer of a voluntary act is chargeable with knowledge of the obvious and that which is usual or to be expected, and although he was ignorant of a material fact or circumstance, if he might have known it by the exercise of ordinary care it cannot be relied upon to effect accidental means. * * * In their application there will be cases, no doubt, in which the courts will feel that the facts and circumstances require a finding that the unknown element was so clearly without the realm of reasonable anticipation as to exclude an hypothesis for accidental means.'

'An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of his deeds.' Western Commercial Traveler's Ass'n v. Smith, supra, [85 F. 405]. This latter rule, while perhaps not always so cogently expressed, is, in the final analysis, the rule which has been applied in Georgi in that line of cases where it is held: 'In order for a plaintiff to recover under a double-indemnity provision of an insurance policy for death resulting,

independently of all other causes, from bodily injuries caused solely by external, violent, and accidental means, it is incumbent upon him to show that in the act which preceded the injury alleged to have caused the death of the insured something 'unforeseen, unexpected, or unusual occurred.' " Supra, 66 S.E.2d p. 122.

The question involved in that case was whether the trial Judge committed error by directing a verdict for defendant, and in disposing of this question, the Georgia Court said:

"Where one places a loaded pistol to his head and voluntarily pulls the trigger, knowing the gun to be loaded and lethal, nothing more appearing, it is unquestionably no accident that his action results in his injury or death, nor can his death or injury be said to have been effected by accidental means. So too, where one engages in a game of Russian Roulette in which all but one of the cartridges are removed from the cylinder of a revolver, the cylinder is spun, the revolver is placed by the participant to his head, and the trigger is voluntarily pulled without ascertaining the position of the cartridge in the chamber in its relation to the firing mechanism, and it occurs that when the trigger is pulled the gun fires and kills or injures the participant, his death or injury is no less intentional than had the gun been full loaded and his death or injury cannot be said to have been the result of accident or effected by accidental means. In such a case, it will be presumed that the participant intended that he should be killed or injured should fate stop the cartridge in the spinning cylinder in firing position. One engaging in such a bizarre passtime with a lethal weapon, if he be com-

pos mentis, knows that he is courting death or severe injury, and will be held to have intended such obvious, and well known results, if he is killed or injured. The insured, so far as the evidence shows, was not 'play-acting' or engaging in a pseudo game of Russian Roulette. The cartridges were not blanks. He placed a 'live' cartridge in the cylinder of the revolver and made no effort to ascertain the position in which the cartridge stopped in relation to the firing mechanism, before pulling the trigger. Such reckless abandon and exposure to a known, and obvious danger cannot be said to have been accidental, nor can it be said that his death was effected by accidental means. The most that can be said for such a participant is that he hoped the cartridge would not stop in the firing position when his turn to pull the trigger came. Under these circumstances we think the plaintiff failed to establish that the insured's death was effected by accidental means within the meaning of that term in the policies of insurance and it follows that the trial court did not err in directing a verdict for the defendant, nor in overruling the motion for a new trial.'' Supra, 66 S.E.2d pp. 123, 124

It is to be noted that the rule stated by the Georgia Court for determining whether death is caused by accidental means, within the terms of an accident insurance policy, is substantially the same as the Tennessee rule, which is laid down in Stone v. Fidelity Cas. Co., supra, and Smith v. Aetna Life Ins. Co., supra.

■ For the reasons herein indicated, the assignment of error is overruled and the judgment of the trial Court is affirmed. The plaintiff-appellant will pay all costs of this appeal.

Carney, P. J. (W.S.), and Matherne, J., concur.